NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia


Decided: May 17, 2022


S22A0457.  NELOMS v. THE STATE.


LaGrua, Justice.

Appellant Andrew Neloms was convicted of malice murder and other offenses in connection with the shooting death of Octavius Brooks.[1]  He raises three claims on appeal: (1) the trial court failed to declare a mistrial sua sponte when an FBI agent testified

---

[1] The shooting occurred on November 1, 2016.  On April 14, 2017, a Fulton County grand jury indicted Appellant for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), felony murder predicated on possession of a firearm by a convicted felon (Count 3), aggravated assault (Count 4), possession of a firearm during the commission of a felony (Count 5), and possession of a firearm by a convicted felon (Count 6).  At a trial from September 25 to October 2, 2018, a jury found Appellant guilty of all counts.  The trial court sentenced Appellant to serve life in prison without the possibility of parole for Count 1 and five years each for Counts 5 and 6, to be served consecutively, for a total sentence of life plus ten years.  The other counts were either merged or vacated by operation of law.  On October 4, 2018, Appellant filed a motion for new trial, which he amended through new counsel on March 18, 2021.  The trial court held a hearing on May 21, 2021, and denied Appellant's amended motion for new trial on October 14, 2021.  Appellant timely filed a notice of appeal, and the case was docketed to this Court's April 2022 term and thereafter submitted for a decision on the briefs.

regarding inadmissible evidence; (2) the trial court failed to conduct a *Faretta*[2] hearing when Appellant declared that he wanted new attorneys; and (3) trial counsel rendered constitutionally ineffective assistance for failing to object to hearsay. We see no error, so we affirm.

1. The evidence presented at trial showed that on November 1, 2016, a block party was taking place at an apartment complex known as Alison Court in Fulton County. Appellant and his girlfriend, Sierra Scott, were at the apartment of Mya Lewis and Tabborious Thompson. Brooks was also present at the invitation of Thompson.

According to Scott, at some point during the evening, Appellant and Thompson left, leaving Scott and Brooks in the apartment. Scott went into a back bedroom by herself, and Brooks entered shortly thereafter. Brooks began to make sexual advances toward Scott, who rebuffed him. Brooks then left the apartment, and Scott

---

[2] See *Faretta v. California*, 422 U.S. 806 (95 SCt 2525, 45 LE2d 562) (1975).

2

left to look for Appellant. When she found him moments later, she told Appellant that Brooks "could have raped" her. Scott then left Alison Court by herself and returned to a nearby hotel where she was staying with Appellant and two other friends.

Cicely Thicklin, who was attending the block party, testified that she was sitting on the front steps of the apartment building drinking wine with Lewis. She saw Brooks sitting in the driver's seat of his car, which was parked outside the front door of the apartment. Brooks was drinking a beer, listening to music, and conversing with Thicklin and Lewis. Brooks did not have a weapon with him. At one point, Thicklin also saw Appellant speaking with Brooks, who was "making little gestures, and [Appellant] didn't like it, and then [Appellant] disappeared."

Thicklin next saw Appellant come around the rear of Brooks's car wielding a shotgun. According to Thicklin, Appellant "pointed it at the victim's chest and he was saying something to the victim." Thicklin fled up the stairs, knocking on apartment doors, but nobody answered to let her in. While she was doing so, she heard two

gunshots, then heard the blaring horn from Brooks's car, which was later determined to be Brooks's head hitting the steering wheel. Thicklin called out to Thompson, who responded to her and said, "[Appellant] done killed that man." Thicklin ran to a nearby convenience store where she met up with Lewis. The two then walked back to Alison Court together, and Lewis called 911 to report the shooting.

Police officers responded to Alison Court and found Brooks with a gunshot wound to his chest, but did not find a weapon at the crime scene. The medical examiner testified that Brooks was shot twice: once in the chest and a second time in his back. A firearms expert testified that Brooks was shot at close range with a shotgun.

Police officers interviewed witnesses at the crime scene and provided the lead investigator, Detective Summer Benton, with contact information for Thicklin. Detective Benton contacted and interviewed Thicklin, who provided Detective Benton with a screenshot of a photo from Instagram and told Detective Benton that the man in the photo was the person who shot Brooks with a

4

shotgun. Thicklin also told Detective Benton that she knew the person in the photo "from around the neighborhood." Detective Benton sent a copy of the photo to police officers via email for identification assistance, and an officer responded and provided Detective Benton with Appellant's name, which the detective verified through police department databases. Responding officers also provided Detective Benton with contact information for Lewis, whom Detective Benton interviewed. During the interview, Detective Benton conducted a photographic lineup, and Lewis identified Appellant as the person running from the scene immediately after gunshots were fired. Based on these interviews, Detective Benton obtained an arrest warrant for Appellant.

Scott testified that on the night of the shooting, Appellant returned to the hotel where he had been staying with Scott and other friends. He told Scott that he wanted to get a haircut. Scott confirmed that Appellant had dreadlocks on the night of the shooting and that he got "a low cut" that night. At some point after the shooting, Scott was with Appellant when she saw a news report

5

of the shooting containing Appellant's picture. Appellant "didn't have a reaction" but was "focused on his appearance" in the news report. Additionally, Scott received a phone call from Lewis, who told Scott, "[Appellant] know what he did." The next day, Appellant insisted that Scott go with him to Savannah; Scott agreed and left with Appellant and two people named Nino and Dallas. The four left in a blue Chevy Malibu and stayed at a La Quinta Inn. The next day, Scott and Appellant left the hotel room to get cigarettes, but they were stopped and arrested by FBI agents as they were leaving the hotel parking lot.

Douglas Dye, an FBI Special Agent based in Savannah, received a phone call in January 2017 from agents in Atlanta indicating that Appellant was possibly at a La Quinta Inn in Savannah. On January 11, Agent Dye directed another agent to take down the license plates of cars in the hotel parking lot; a blue Chevy Malibu was associated with Appellant. Agent Dye then spoke with hotel staff, who provided him with the room number associated with the Malibu. Agent Dye directed other agents to monitor that

6

room. When Appellant and Scott left the room and entered the Malibu, agents started to arrest Appellant. Appellant tried to escape by driving away, but collided with FBI vehicles that blocked the exit. Appellant was removed from the vehicle; Agent Dye handcuffed him and searched him for weapons. After his arrest, Appellant was returned to Atlanta.

Upon his return to Atlanta, Appellant asked to speak with the investigating officers. In recorded interviews played for the jury, Appellant initially told the officers that he was not present at the scene of the shooting, but later recanted that story and claimed that he shot Brooks in self-defense. While in jail, Appellant made numerous phone calls to friends, explaining about how he "got caught" and how he told the police a story about fighting with Brooks over the gun; recordings of these phone calls were also played at trial. Appellant testified at trial and maintained that he shot Brooks in self-defense.

2. Appellant first contends that the trial court should have declared a mistrial sua sponte upon the introduction of certain

7

allegedly inadmissible evidence. We disagree.

At a pre-trial suppression hearing, Appellant moved to suppress the results of a search of the Savannah hotel room where Appellant was staying on the day he was arrested. The prosecutor announced that he had no intention to enter any evidence of the search, and the trial court granted the motion to suppress.

At trial, Agent Dye testified to the following regarding Appellant's arrest in the hotel parking lot:

> PROSECUTOR: And was a weapon found on the defendant?
> DYE: No.
> PROSECUTOR: And did you pat the defendant down?
> DYE: I do. [sic]
> PROSECUTOR: And, I guess, tell the jurors about that?
> DYE: Anytime that I pat somebody down, I always talk to them, tell them what I'm about to do, I ask them, do you have any weapons or anything sharp on you that's going to hurt me, I am about to pat you down.
> PROSECUTOR: And what happens after that?
> DYE: He said he did not have any weapons on him, but he said if there was a gun, it's in the hotel room, and it was his.

Appellant objected, and outside the presence of the jury, the prosecutor argued that Appellant's statement to Agent Dye was a

spontaneous utterance. Appellant argued that the statement was a custodial statement made without *Miranda*[3] warnings. The prosecutor responded that the statement was not custodial because Appellant was not being interrogated and reiterated his argument that the remark was a spontaneous utterance.

Appellant requested both that the trial court provide a curative instruction and that the remark be stricken from the record. Notably, Appellant did not move for a mistrial. When the jury returned, the trial court gave the following instruction:

> Ladies and gentlemen, I want to instruct you that the last thing said, I believe, by this witness was that the defendant made a statement that he did not have a gun on him, but there was a gun in a hotel room, and that was an improper statement, and it needs to [be] stricken from your evidence, as well as stricken from the record, all right. We are going to proceed now. Please don't weigh that at all in determining this case.

Appellant did not object to this instruction. However, he now argues on appeal that the trial court "should have declared a mistrial due to [the] manifest necessity created by the prosecution's

---

[3] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

behavior notwithstanding the request for the curative instruction," and despite the fact that the trial court actually provided a curative instruction. Appellant claims that the prosecutor engaged in prosecutorial misconduct by arguing that Appellant's statements to Agent Dye were spontaneous utterances, even though these statements were made on the theory that Appellant was in custody. Appellant argues that this alleged prosecutorial misconduct was sufficient to warrant the declaration of a mistrial, and that the trial court abused its discretion in failing to declare a mistrial. However, Appellant has waived review of this issue.

> A motion for mistrial must be promptly made as soon as the party is aware of the matter giving rise to the motion. If the defendant did not make a contemporaneous motion for a mistrial at the time the defendant became aware of the matter giving rise to the motion, then the defendant has waived review of this issue on appeal.

*Thomas v. State*, 310 Ga. 579, 581 (2) (853 SE2d 111) (2020) (citations and punctuation omitted). Here, Appellant did not move for a mistrial at the time of the prosecutor's alleged misconduct. Instead, he requested a curative instruction, which the trial court

then provided to the jury without objection from Appellant. Because Appellant failed to make a motion for mistrial contemporaneously with the behavior of which he now complains, the issue of whether the trial court should have sua sponte declared a mistrial is not properly before this Court for review. See id. at 582 (2); see also *Coley v. State,* 305 Ga. 658, 662 (3) (827 SE2d 241) (2019) (issue not preserved for appellate review where a motion for mistrial was not made contemporaneously with the testimony that appellant complained about). Accordingly, this enumeration fails.

2. Appellant next contends that the trial court erred when it failed to hold a hearing to determine whether he was knowingly and intelligently waiving his right to counsel. See *Faretta v. California,* 422 U.S. 806, 819-820 (III) (A) (95 SCt 2525, 45 LE2d 562) (1975) ("When an accused manages his own defense, he relinquishes . . . many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must knowingly and intelligently forgo those relinquished benefits." (citations and punctuation omitted)). We discern no error.

11

On the third day of trial, after a court recess, but before the jury was called back in, Appellant's trial counsel indicated that Appellant "would like to proceed as a pro se litigant." Trial counsel stated that Appellant "doesn't believe the representation he's receiving . . . is in his best interest." Trial counsel then requested that the court hold a *Faretta* hearing to determine whether Appellant was intelligently and knowingly waiving his right to counsel. The prosecutor did not object to this request.

In response, the trial court asked, "Well what is the law? Do I have to let him in the middle of the trial become pro se? I mean, he should have decided this before we got this far, in my view." Appellant then responded, stating, "Maybe if somebody could help me, assist me, or be another representative"; Appellant also indicated that he felt that trial counsel was unprepared. The court responded that they were in the middle of trial and would continue, to which Appellant asked, "There is no way I can — if I could fire my lawyers and get another lawyer to represent me?" The court reiterated that it would proceed with trial and did so. Appellant's

counsel continued to represent him.

Later that day, the trial court excused the jury and addressed the matter again. The trial court told Appellant that he could choose either to represent himself or continue with his current counsel but that he could not have new counsel appointed. Appellant responded that he would continue with his current counsel and confirmed that decision two more times before the trial continued. Appellant continued with this counsel through the close of trial and sentencing.

Both the federal and Georgia constitutions guarantee a criminal defendant both the right to counsel and the right to self-representation. See *Faretta,* 422 U.S. at 819-820 (III) (A); *Taylor v. Ricketts*, 239 Ga. 501, 502 (238 SE2d 52) (1977). "The pre-trial unequivocal declaration of a defendant that he wishes to represent himself must be followed by a hearing at which it is determined that the defendant knowingly and intelligently waives the traditional benefits associated with the right to counsel." *Danenberg v. State*, 291 Ga. 439, 440 (2) (729 SE2d 315) (2012) (citation and punctuation

13

omitted). "Requests to proceed pro se *during* trial, however, are treated differently." *Owens v. State*, 298 Ga. 813, 814 (2) (783 SE2d 611) (2016) (emphasis in original). A defendant "cannot frivolously change his mind in midstream by asserting his right to self-representation in the middle of his trial." *Thaxton v. State*, 260 Ga. 141, 142 (2) (390 SE2d 841) (1990) (citation and punctuation omitted).

Here, Appellant's indication that he sought to represent himself was not made prior to trial, nor was it unequivocal. Appellant made his request on the third day of trial, after several witnesses had already testified. Further, when Appellant spoke personally to the court about his request, he indicated that he was seeking new counsel to assist him; he did not indicate that he wanted to represent himself. And upon revisiting the matter, Appellant told the trial court that he would continue with his current counsel. Thus, we cannot say that Appellant's request was an unequivocal one made prior to trial, so a *Faretta* hearing was not required. See *Danenberg*, 291 Ga. at 441 (2) (appellant's request one

hour into jury selection wishing to "dismiss [his lawyers] and be given a little time to hire other lawyers or utilize a public defender or proceed pro se" was not an unequivocal assertion of his right to represent himself, and the trial court's denial was not a deprivation of appellant's constitutional rights); *Thaxton¸* 260 Ga. at 142 (2) (appellant's expression of dissatisfaction with his attorney "cannot be construed as an assertion, much less an unequivocal assertion, of his right to represent himself"). Accordingly, this enumeration fails.

3. Appellant next contends that his trial counsel rendered constitutionally ineffective assistance by failing to raise a hearsay objection to an investigator's testimony. This enumeration fails.

(a) To prevail on this claim of constitutionally ineffective assistance of counsel, Appellant must show "both that his trial counsel's performance was deficient and that this deficiency prejudiced his defense." *Merritt v. State,* 310 Ga. 433, 435 (2) (851 SE2d 555) (2020) (citing *Strickland v. Washington,* 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984)).

To establish deficient performance, [Appellant] must

15

overcome the strong presumption that his counsel's conduct falls within the broad range of reasonable professional conduct and show that his counsel performed in an objectively unreasonable way in the light of all the circumstances.

Id. (citation and punctuation omitted). And to establish prejudice, Appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Appellant must prove both prongs, and if he fails to prove one prong, this Court need not examine the other. See *Merritt*, 310 Ga. at 435 (2).

OCGA § 24-6-613 (b) provides that extrinsic evidence of a witness's prior inconsistent statement may be admitted, so long as "the witness is first afforded an opportunity to explain or deny the prior inconsistent statement and the opposite party is afforded an opportunity to interrogate the witness on the prior inconsistent statement or the interests of justice otherwise require." See also *London v. State*, 308 Ga. 63, 66-67 (3) (a) (838 SE2d 768) (2020). Additionally, prior inconsistent statements that meet the requirements of OCGA § 24-6-613 (b) are not hearsay if the

16

declarant testifies at trial and is subject to cross-examination. See

OCGA § 24-8-801 (d) (1) (A). "The failure of a witness to remember

making a statement, like the witness's flat denial of the statement,

may provide the foundation for calling another witness to prove that

the statement was made." *Hood v. State*, 299 Ga. 95, 99 (2) (786

SE2d 648) (2016).

(b)   Here, Thompson was called as a witness for the State.

During his direct examination, he began to repeatedly invoke his

right against self-incrimination under the Fifth Amendment to the

United States Constitution in response to the prosecutor's

questions. The prosecutor requested that the trial court instruct

Thompson to answer the questions, "as pleading the Fifth is for

questions that would incriminate yourself." The court excused the

jury and conducted a conference in chambers with counsel,[4] where

the prosecutor suggested that the court instruct Thompson to

answer the questions to the best of his ability without incriminating

himself. Appellant's trial counsel noted that Thompson had no

_____

[4] Appellant waived his right to be present for this conference.

17

previous written or recorded statement that could corroborate or impeach his testimony. However, the prosecutor responded that it could call Fred Glenn as an additional witness; Glenn was an investigator with the District Attorney's office and was present when the prosecutor met with Thompson before trial. Upon returning to the courtroom, the prosecutor continued to question Thompson, who largely testified, "I can't remember." Thompson was then cross-examined by the defense.

Later, Glenn was called as a witness, and he testified that Thompson and one of Thompson's girlfriends, Tameka Wright, met with the prosecutor and Glenn in September 2018 at Wright's home and that Thompson was "very forthcoming" in front of the prosecutor and Glenn.[5] Thompson told Glenn and the prosecutor that Appellant lived with him at the time of the incident; that Appellant told him he was going to kill Brooks because Brooks told Scott "that she had pretty lips"; that Brooks was unarmed and not bothering

---

[5] Wright testified at trial and corroborated that both Glenn and the prosecutor met with Thompson and that Thompson answered their questions.

anyone; and that he saw Appellant shoot Brooks in the chest and back with a shotgun.

At the motion-for-new-trial hearing, Appellant's trial counsel testified that she agreed that "on the face of it, [Glenn's testimony] was hearsay." However, she also testified that she chose not to object to Glenn's testimony because she believed the prior inconsistent statement exception to the hearsay rule applied to Glenn's testimony.

Here, Thompson's alleged lack of memory was sufficient foundation to allow Glenn to testify as to the content of Thompson's statements during the September 2018 meeting. See *Murdock v. State*, 299 Ga. 177, 179-180 (4) (787 SE2d 184) (2016). Further, Thompson was present at trial, was asked about the statements he made during the September 2018 meeting with the prosecutor and Glenn, and was subject to cross-examination.

Thus, Glenn's testimony was properly admissible as prior inconsistent statements, and an objection on this ground would have been meritless. Trial counsel therefore cannot be deemed ineffective

19

for failing to make a meritless objection on this ground. See *Hendrix v. State*, 298 Ga. 60, 65-66 (2) (c) (779 SE2d 322) (2015) ("Insofar as the State properly laid the foundation for the detective's testimony regarding these witnesses' prior inconsistent statements, trial counsel had no grounds for challenging this testimony and cannot be adjudged ineffective for failing to object to it."). Accordingly, Appellant's ineffective assistance claim fails.

*Judgment affirmed. All the Justices concur.*