318 Ga. 855
FINAL COPY

S24A0139. SCONYERS v. THE STATE.

ELLINGTON, Justice.

Charles Michael Sconyers appeals his convictions for malice murder and cruelty to children in the first degree in connection with the death of Chelsea Finch's 23-month-old son, Lincoln Davitte, from blunt-force trauma to his skull.[1] The State presented evidence at trial showing that Sconyers and Finch lived together and that while Lincoln was at home in the sole care of Sconyers, Lincoln

---

[1] The crimes occurred on May 1, 2019. On November 5, 2020, a Columbia County grand jury indicted Sconyers for malice murder, two counts of felony murder, and one count each of aggravated assault and cruelty to children in the first degree. After a jury trial that ended on May 13, 2022, Sconyers was found guilty on all counts. On that same day, Sconyers was sentenced to serve life in prison for malice murder and concurrent 20-year prison terms for aggravated assault and cruelty to children. The felony murder counts were vacated by operation of law. The trial court later conducted a resentencing hearing and, on May 25, 2022, entered a new sentence that merged the aggravated assault count into the malice murder conviction but did not change the other sentences. Sconyers filed a timely motion for new trial, which he amended on September 12, 2022. After a hearing on February 27, 2023, the trial court denied the amended motion for new trial on March 20, 2023. Sconyers filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2023 and submitted for a decision on the briefs.

sustained a severe head injury that several medical experts testified was not consistent with a ground-level fall on the patio as described by Sconyers. Lincoln died later at the hospital. Sconyers contends that the trial court erred in four ways: repeatedly permitting the State to introduce evidence of previous injuries to Lincoln without cautioning the jury that the parties agreed that Sconyers did not cause those injuries; instructing the jury about "prior difficulties" between Sconyers and Lincoln without limiting what evidence qualified as prior difficulties; admitting hearsay statements allegedly made by Finch; and permitting the prosecution to impeach Finch improperly. For the reasons explained below, we affirm.

Sconyers had moved in with Lincoln and Finch, as well as her then-four-year-old daughter, near the end of 2018. On May 1, 2019, Finch had to work until 6:00 p.m. and asked Sconyers, who was not working his job as a firefighter and EMT because he had recently been injured, to pick up Lincoln from daycare while she went to the grocery store. Surveillance video footage showed Finch at the grocery store, and other video footage showed Sconyers leaving the

2

daycare with Lincoln at 6:19 p.m. An investigator testified that he reviewed surveillance video footage from the daycare for the whole day and did not observe anything that could have contributed to Lincoln's injuries. At some point, Sconyers called a friend and co-worker who was a paramedic and told him about an unconscious child with breathing problems. The co-worker told Sconyers to "[h]ang up and call 911." Sconyers called 911 at 6:36 p.m. and subsequently called Finch, screaming that she needed "to get home now" and that something happened to Lincoln. Sconyers said he did not know what happened. There was no evidence that anyone other than Sconyers was at the home with Lincoln at that time. Finch arrived before emergency responders and ran into the bedroom where Lincoln was lying on the bed unresponsive with a "bulge" on the right side of the top of his head, and Sconyers was trying to assess Lincoln as "an EMT should do" and "get his pupils to react." When they heard sirens, Finch picked up Lincoln, ran with him, and begged Sconyers to take him to the ambulance. Sconyers took Lincoln the rest of the way and was invited to ride in the ambulance

to the hospital because Sconyers was an EMT.

The firefighters who first responded to the 911 call testified that Lincoln was unresponsive and not breathing adequately and that Sconyers told them Lincoln had a ground-level fall off a ledge onto concrete and had other bruises on his face and head because he had a problem with sleepwalking. One of the two paramedics, who arrived in an ambulance very soon after the firefighters, testified that Lincoln was "posturing," which typically happens after a severe closed-head injury, and that based on her training and expertise the injury did not appear to be caused by a ground-level fall. The witness testified that Sconyers told her "two stories" in the back of the ambulance: first, Lincoln was standing on a porch and fell about two to three feet off a ledge; and second, he fell on a "wheel chock"; and Sconyers later told another paramedic that Lincoln slipped on a door threshold and tripped and fell. The other paramedic also testified based on her experience that Lincoln's skull fracture was not consistent with a fall of two to three feet. Sconyers kept repeating that it was his "fault" if anything happened to Lincoln.

4

Finch testified that at the hospital, after Lincoln had surgery, Sconyers told her that after getting home Lincoln wanted to go outside to play with chalk. Sconyers opened the outside door, went to the bathroom to take his knee brace off, and told Lincoln to go outside. Lincoln then "took off running," and Sconyers heard a loud thump and a cry and ran to find Lincoln lying out back on the concrete patio. Finch further testified that no one was at home with Sconyers and Lincoln at the time, that she did not know of any prior fracture of Lincoln's skull, and that she was not aware of anything prior to the fatal incident that could have resulted in any type of brain injury to Lincoln.

Both parties presented medical experts who testified about Lincoln's injuries. Extensive testimony from the State's experts showed that the nature and severity of Lincoln's fatal brain injury made it highly unlikely the injury was caused accidentally by a fall at ground level or from a low height. One of those experts testified that symptoms of that fatal injury would have appeared immediately after the impact, and Lincoln could not have continued

5

to move normally after sustaining those injuries. The GBI medical examiner who performed an autopsy on Lincoln classified Lincoln's death as a homicide because her examination and the medical records indicated that "non-accidental-inflicted trauma" caused the fatal injury and because the historical account of the incident provided by Sconyers did not explain Lincoln's injuries. One of Sconyers's medical experts testified that it was reasonably possible that Lincoln's fatal injury resulted from an accident, in part because a prior head injury that caused a subdural hematoma made him "more prone to get a new one with more serious complications."

Sconyers testified in his own defense as follows. He was a sergeant and advanced EMT with the Augusta Fire Department. The week before Lincoln's death, Sconyers and his lieutenant went into a burning home to search for a little boy who was unaccounted for at the time, and Sconyers fell through the floor, injuring his knee. For that reason, Sconyers had a knee brace, was on leave, and was able to pick up Lincoln from daycare on May 1, 2019. When they arrived home, Sconyers told Lincoln he could play outside with chalk

and opened the door for him. Sconyers went to use the bathroom and adjust his knee brace, and he told Lincoln to go outside. Lincoln "took off running," and Sconyers heard a thump and heard Lincoln "almost scream." Sconyers strapped his knee brace back on, "hobbled" outside as fast as he could, and found Lincoln lying "outside of [the] back patio." Lincoln turned his head "just a little bit" and became unresponsive. Sconyers stabilized Lincoln's neck and body, took him inside, and immediately called 911.

1. Sconyers contends that the trial court erred by permitting the State repeatedly to introduce evidence of Lincoln's previous injuries without cautioning the jury that the parties agreed that Sconyers did not cause those injuries.

Prior to the presentation of any evidence to the jury, Sconyers moved under OCGA § 24-4-404 (b) ("Rule 404 (b)") to exclude any testimony that Lincoln "had black eyes on two different occasions" in the months before his death. Rule 404 (b) requires the exclusion of "[e]vidence of other crimes, wrongs, or acts" the defendant may have committed to prove the defendant's bad character and show he

7

acted "in conformity therewith" in committing the charged offense. Sconyers argued that Lincoln's prior black-eye injuries fell under Rule 404 (b) because they were extrinsic to Lincoln's death, and that they had to be excluded under that rule because the State could not prove that Sconyers caused the injuries. But the prosecutor argued that Lincoln's prior injuries did not fall under Rule 404 (b) at all because they were intrinsic to the crime. See *Roberts v. State*, 315 Ga. 229, 235 (2) (a) (880 SE2d 501) (2022) ("The limitations and prohibition on 'other acts' evidence set out in [Rule 404 (b)] do not apply to 'intrinsic evidence.'" (citation and punctuation omitted)). Specifically, the prosecutor argued that the State needed to introduce the prior injuries to explain the circumstances behind Lincoln's prior head injuries, because Sconyers's expected defense was that Lincoln's prior head trauma — which caused the presence of both "old blood and new blood" in Lincoln's brain, according to a defense expert — could have contributed to his death.[2] The trial

---

[2] One of the State's medical experts also testified that surgery on Lincoln revealed "old clot and new clot," that is, "blood from a prior injury and blood from this injury."

court agreed with the prosecution that the prior injuries were admissible as intrinsic evidence — not falling under Rule 404 (b) — because they allowed the State to explain and rebut the testimony of Sconyers's expert. See *Johnson v. State*, 312 Ga. 481, 491 (4) (863 SE2d 137) (2021) (Evidence is intrinsic when it is "necessary to complete the story of the crime." (citation and punctuation omitted)). The trial court also found that the evidence satisfied OCGA § 24-4-403 ("Rule 403").

On appeal, Sconyers does not challenge the trial court's ruling that the prior injuries were admissible as intrinsic evidence. Instead, he raises a two-part argument that he did not raise below: that the trial court allowed testimony about Lincoln's previous injuries to be repeatedly introduced[3] and did not caution the jury that the parties agreed that Sconyers did not cause those injuries. But Sconyers never objected on those bases in the trial court, and he

[3] Sconyers described the evidence of Lincoln's prior injuries as going "far beyond merely providing a medical explanation for 'old blood'" and having "function[ed]" as additional evidence of "prior difficulties" between Sconyers and Lincoln "through the State's associations and inferences created through repetition and questioning."

never requested a limiting instruction that the parties had agreed Sconyers did not cause Lincoln's prior injuries. This enumeration therefore can be reviewed only for plain error. See OCGA §§ 17-8-58 (b); 24-1-103 (a) (1); *Henderson v. State*, 317 Ga. 66, 78 (4) (c) (891 SE2d 884) (2023) (The appellant "did not ask for a limiting instruction at trial, so we review his claim [that allowing certain evidence was error without an accompanying limiting instruction] only for plain error."); *Payne v. State*, 313 Ga. 218, 221 (1) (869 SE2d 395) (2022) (The appellant asserted on appeal that the trial court erred by admitting testimony about a certain incident because it "did not qualify as a prior difficulty" under Rule 404 (b), but he "did not object on the ground" asserted on appeal. "Thus, [he] failed to preserve [the enumerated] error for ordinary review."). We see no plain error.

To show plain error, an appellant must identify an error that was not affirmatively waived, was obvious beyond reasonable dispute, affected the outcome of his trial or otherwise affected his substantial rights, and seriously affected the fairness, integrity, or

10

public reputation of judicial proceedings. See *Henderson*, 317 Ga. at 78 (4) (c); *Payne*, 313 Ga. at 222 (1). "For an error to be obvious for purposes of plain error review, it must be plain under controlling precedent or in view of the unequivocally clear words of a statute or rule." *Grier v. State*, 313 Ga. 236, 242 (3) (b) (869 SE2d 423) (2022) (citation and punctuation omitted).

Sconyers's claim of error relates to testimony from Finch, a daycare employee, and a Department of Family and Children Services ("DFCS") employee addressing Lincoln's black eyes. Finch testified that she saw Lincoln with black eyes on two occasions prior to his death. In February 2019, Lincoln was sleeping, and she and Sconyers were in the bathroom when they heard something. Sconyers left and returned "in a couple of seconds" with Lincoln, who had a big "goose egg" in the middle of his head but was "grinning," did not have dilated pupils, continued to act like a "normal" child the rest of the night, and was not lethargic or fussy. Finch believed Lincoln was injured a few times from sleepwalking, and she discussed the situation with Lincoln's pediatrician. Finch testified

11

that on April 29, 2019, while Finch's mother was babysitting Lincoln, he was climbing on his highchair when his foot slipped and he hit his eye on it. The defense later called Finch's mother, who confirmed that when she was with Lincoln a day or two before his fatal injury, he injured himself on a highchair, causing a little bruise on the right side of his face.

An employee at the daycare center that Finch's children attended, Brenda Warren, testified that in February 2019 she filled out an incident report when Lincoln arrived with two black eyes and a bruised face, and Finch said he was jumping on his bed and hit the top of it, but she did not take him to the doctor because her "boyfriend was a paramedic" and he did not feel it was necessary. Because Finch's comments "just didn't seem right," Warren ultimately called DFCS. Afterward, Warren noticed that Sconyers was not picking Lincoln up at the daycare anymore. Warren also testified to a second incident, on April 29, 2019, two days before Lincoln's death, when Lincoln had a black eye and Warren was told that he had fallen, and a third incident, on May 1, when Lincoln had

a cut on his lip. Warren described Lincoln as an "active" and "happy" child who "napped well," "ate well," and played with his friends on the playground.

The DFCS employee who investigated the two black-eye incidents testified that the daycare called DFCS because it was "concerned about the safety of the child" and felt that the incidents were "too close" in time. As a result, she talked with Finch and Sconyers and was told that Lincoln's pediatrician had diagnosed him as a sleepwalker, and the first injury occurred when Lincoln fell while sleepwalking, and that the second injury occurred when Lincoln fell on a highchair at his grandmother's home.

We see no plain error because Sconyers's claims related to this testimony about the circumstances surrounding Lincoln's prior injuries do not show that the trial court acted contrary to any controlling authority. Sconyers contends the trial court should have instructed the jury that the parties had agreed he did not cause Lincoln's prior injuries. But we are aware of no authority requiring the court to give that limiting instruction. See *Salvesen v. State*, 317

13

Ga. 314, 317 (2) (893 SE2d 66) (2023) (The State is "not required to stipulate to . . . the circumstances surrounding the murder." (citation and punctuation omitted)); *Anderson v. State*, 313 Ga. 178, 183 (3) (a) (869 SE2d 401) (2022) ("[A] limiting instruction generally is not warranted for intrinsic evidence."). Sconyers also contends that too many witnesses testified about the prior injuries, but again, no authority required a limit on the number of those witnesses. The existence of "some overlap" and "substantial prejudicial effect" in the testimony of multiple witnesses does not necessarily make that evidence so needlessly cumulative or unfairly prejudicial as to require its exclusion under Rule 403. *Naples v. State*, 308 Ga. 43, 53 (2) (e) (838 SE2d 780) (2020). Accordingly, it was not obvious either that some of the testimony about Lincoln's prior injuries should have been excluded or that the jury should have been instructed that Sconyers did not cause those injuries. Sconyers therefore has failed to show error that is clear beyond reasonable dispute.[4]

---

[4] Sconyers also argues under this enumeration that certain evidence of his prior difficulties with Lincoln – which we describe below in Division 3,

14

2. Sconyers contends that the trial court erred when it

specifically, Lincoln's jealousy toward Sconyers, Sconyers hitting Lincoln, and the arguing and fighting between the two – was improperly admitted under Rule 404 (b). As an initial matter, Sconyers's objection at trial did not extend to this evidence, contrary to his contention on appeal. His specific objection in the trial court was only to testimony that Lincoln "had black eyes on two different occasions several months before the incident," and Sconyers's subsequent argument was limited to the black-eye injuries. Thus, this claim also can be reviewed only for plain error. See *Payne*, 313 Ga. at 221 (1).

Sconyers argues that Lincoln's jealousy was not admissible as "other act" evidence under Rule 404 (b) because it was not an act at all, and also because it was not relevant. But even if evidence of jealousy was not an "act" for purposes of Rule 404 (b), it could be admissible as relevant evidence of the nature of Sconyers's poor relationship with Lincoln. See *Shellman v. State*, 318 Ga. 71, 77-78 (3) (b) (897 SE2d 355) (2024) (holding that evidence of the relationship between the defendant and the victim, including jealousy, was relevant because it shed light on the defendant's motive in committing the charged offenses). Rule 404 (b) is a "rule of inclusion," *State v. Jones*, 297 Ga. 156, 159 (2) (773 SE2d 170) (2015), so the fact that evidence may not be admissible under that rule does not mean that the rule *excludes* the evidence.

Sconyers also argues generally that none of his prior difficulties with Lincoln were relevant except in a generic fashion to show motive. But evidence of a defendant's prior acts is ordinarily admissible in evidence under Rule 404 (b) "when the defendant is accused of a criminal act against that person, where the nature of the relationship between the defendant and the victim sheds light on the defendant's motive in committing the offense charged." *Lowe v. State*, 314 Ga. 788, 793 (2) (a) (879 SE2d 492) (2022) (citation and punctuation omitted). Sconyers additionally contends that the prior-act evidence was not admissible under Rule 404 (b) because there was insufficient evidence to prove that he committed the acts. In his view, all of the evidence that he committed the prior acts was inadmissible hearsay from Finch's co-workers. But as we explain more fully in Division 3, Sconyers did not object to the co-workers' testimony. By statute, "if a party does not properly object to hearsay, the objection shall be deemed waived, and the hearsay evidence shall be legal evidence and admissible." OCGA § 24-8-802. Sconyers has failed to show that it is obvious beyond reasonable dispute that if he had properly objected under Rule 404 (b), the trial court would have abused its discretion in finding that the prior difficulties evidence met the requirements of that rule. Accordingly, admission of the prior difficulties into evidence does not amount to plain error.

instructed the jury about "prior difficulties" between Sconyers and Lincoln. The trial court instructed the jury as follows:

> Evidence of prior difficulties between the defendant and the alleged victim, Lincoln Davitte, has been admitted for the sole purpose of illustrating, if it does, the state of feeling between the defendant and the alleged victim.
>
> Whether this evidence illustrates such matters is a matter solely for you, the jury, to determine, but you are not to consider such evidence for any other purpose.

Sconyers argues that this instruction failed to provide any limitation as to what evidence was subject to it, that the instruction improperly assumed there had been evidence of prior difficulties perpetrated by Sconyers against Lincoln, and that the instruction did not define "state of feeling" even though that was the only determination the instruction left to the jury and would naturally be inferred by the jury. Although Sconyers objected to this instruction during the charge conference, he did not object to it on any ground after the jury was charged. Thus, Sconyers did not properly preserve any of his claims, and, indeed, he acknowledges that the instruction on prior difficulties is subject to review for plain error only. See OCGA § 17-

16

8-58 (b); *Rawls v. State*, 310 Ga. 209, 217-218 (4) (850 SE2d 90) (2020). We see no plain error.

All of the language in the instruction on prior difficulties that Sconyers now questions "was and is consistent with Georgia's pattern jury instructions, and [Sconyers] has not otherwise shown that there was plain error." *Taylor v. State*, 306 Ga. 277, 286-287 (3) (c) (830 SE2d 90) (2019).[5] Sconyers has pointed to no controlling precedent holding that a trial court erred in connection with the pattern charge on prior difficulties. See *McKibbins v. State*, 293 Ga. 843, 853 (7) (750 SE2d 314) (2013) (seeing no plain error where the appellant pointed to no decision that failing to define "accomplice" in the pattern charge on accomplice testimony was error). More

---

[5] See also *Dyal v. State*, 297 Ga. 184, 188 (5) & n.9 (773 SE2d 249) (2015) (similar holding with respect to a previous version of the pattern jury instruction on prior difficulties, also setting out the current version that was applicable at the time of Sconyers's trial); Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.34.20 (4th ed. 2007, updated Aug. 2022) ("Evidence of prior difficulties (or lack thereof) between the defendant and (the alleged victim) (a witness) has been admitted for the sole purpose of illustrating, if it does, the state of feeling between the defendant and the (alleged victim) (witness); (the reasonableness of any alleged fears by defendant or alleged victim). Whether this evidence illustrates such matters is a matter solely for you, the jury, to determine, but you are not to consider such evidence for any other purpose.").

specifically, there has been no requirement that the trial court define "state of feeling." See id. at 854 (7) ("[A] trial court is not required to instruct on the meaning of all words used in the charge, particularly words of common understanding." (citation and punctuation omitted)). Sconyers has cited no authority that the instruction at issue improperly recognizes that some evidence of prior difficulties had been admitted. And there is no authority requiring a trial court to specify what evidence qualifies as prior difficulties. See *Chester v. State*, 267 Ga. 9, 12 (2) (471 SE2d 836) (1996) (holding that a trial court is not required to specifically point out particular evidence to which an instruction applies and that a trial court should refuse to give jury charges that "are more adjusted to the exhortation of counsel than to the impartial clarity which should characterize the instructions of the court" (citation and punctuation omitted)); see also *Collins v. State*, 312 Ga. 727, 743 (7) n.15 (864 SE2d 85) (2021) (same). Because the instruction on prior difficulties "did not involve a clear departure from a settled legal rule," it did not amount to plain error. *McKibbins*, 293 Ga. at 854

18

(7).

3. Sconyers contends that the trial court erred by admitting testimony about alleged hearsay statements made by Finch about Sconyers's and Lincoln's arguing, and about Sconyers hitting Lincoln. Sconyers argues that the State violated the requirement of OCGA § 24-6-613 (b) ("Rule 613 (b)") that, before extrinsic evidence of a prior inconsistent statement can be admitted into evidence, the witness must be "first afforded an opportunity to explain or deny the prior inconsistent statement." However, because Sconyers failed to object to the testimony at issue on any ground, he acknowledges that this enumeration can be reviewed for plain error only. See OCGA § 24-1-103 (a) (1); *Payne*, 313 Ga. at 221 (1).[6] We see no error, much less plain error.

The alleged hearsay statements of Finch about which Sconyers

---

[6] See also *Harvey v. State*, 300 Ga. 598, 603-604 (4) (a) (797 SE2d 75) (2017) (Because the appellant did not object to a detective's testimony about the prior inconsistent statements of two witnesses, the appellant's assertion that the trial court erred in admitting it could be examined only for plain error.), overruled on other grounds, *Nalls v. State*, 304 Ga. 168, 177-178 (3) (a), 180 (3) (b) (815 SE2d 38) (2018).

complains are found in the testimony of two co-workers of Finch's. One of those co-workers, Carey Story, testified that Finch told Story that she took Lincoln to counseling for "jealousy issues" because he and Sconyers were "arguing a lot" and Lincoln "was telling [Finch] that [Sconyers] hits him." According to Story, Finch attributed Lincoln's injuries to sleepwalking. Another co-worker of Finch's, Sera Druelle, testified that Finch showed Druelle a photo where one of Lincoln's eyes was swollen shut and attributed the injury to the sleepwalking. According to Druelle, Finch had never said anything about Lincoln having behavioral issues until, about a week or a week and a half before the fatal incident, Finch said that she thought Sconyers's "true colors [were] starting to come out"; that when he was trying to pick up Lincoln at the mall, Lincoln "got upset and started pointing at [Sconyers], and Lincoln started hitting his own face," and Finch "turned around and said [to Sconyers] did you hit him?"; and that Lincoln "would have behavioral issues around

[Sconyers]."[7]

Finch testified at trial that she took Lincoln to counseling, which his doctor recommended in December 2018, because he had developed "jealousy issues" with Sconyers. Finch also testified that she and Sconyers were engaged at the time of trial and that she did not believe that he injured Lincoln in any way. She denied that she remembered ever discussing with any of her co-workers that Sconyers and Lincoln had been fighting. Finch also denied that there was ever an incident at a mall when Lincoln indicated Sconyers had hit him and that she ever asked Sconyers if he had hit Lincoln because she and Sconyers were "always together." Finch further denied that she ever had any apprehensions about her relationship with Sconyers or that Sconyers had a temper or argued with Lincoln. Instead, Finch testified, Sconyers and Lincoln "just played like father and son." Finch subsequently denied ever discussing with her co-workers the nature of her relationship with Sconyers. On cross-

---

[7] The DFCS employee also testified about a private interview with Lincoln's sister, who said that Sconyers would spank Lincoln because he was crying.

examination, Finch also denied ever telling anyone she worked with that Sconyers "abuses Lincoln or anything like that"; she asserted that she "wasn't close with anybody in the office" and that she "really kept [her] personal stuff to [her]self."

"[P]rior inconsistent statements that meet the requirements of [Rule 613 (b)] are not hearsay if the declarant testifies at trial and is subject to cross-examination. See OCGA § 24-8-801 (d) (1) (A)." *Neloms v. State*, 313 Ga. 781, 787 (4) (a) (873 SE2d 125) (2022). "The failure of a witness to remember making a statement, like the witness's flat denial of the statement, may provide the foundation for calling another witness to prove that the statement was made." Id. (citation and punctuation omitted).

Here, Finch's denials and alleged lack of memory of her prior statements and their contents were a sufficient foundation to allow other witnesses to testify about the content of those statements, that is, the arguing and the hitting. See *Neloms*, 313 Ga. at 788 (4) (b); *Bridgewater v. State*, 309 Ga. 882, 886-887 (2) (848 SE2d 865) (2020) (One witness's "unambiguous denial that he had ever spoken with

22

[a second witness] — as well as his assertion that he did not recall ever speaking with him — obviated the need for the prosecutor to ask [the first witness] about specific statements he made to [the second witness] and provided sufficient foundation for the State to present extrinsic evidence of such statements."); *Murdock v. State*, 299 Ga. 177, 179-180 (4) (787 SE2d 184) (2016) (A witness's prior inconsistent statement about a shooting was properly admitted under Rule 613 (b) after she testified that "she could not recall the details of the shooting itself or the content of her statement.").

Sconyers complains of the State's failure to confront Finch with the specific extrinsic evidence of her alleged prior inconsistent statements. But as *Bridgewater* and *Murdock* indicate, Finch's failure to recall making any statement at all about fighting, abuse, or anything like that, as well as her denial of the mall incident and Sconyers arguing with Lincoln, relieved the prosecutor of the need to ask about specific statements. Moreover, at the prosecutor's request, the trial court directed Finch to remain subject to recall and the rule of sequestration. See *Wammock v. Celotex Corp.*, 793 F2d

23

1518, 1522-1523 (II) (11th Cir. 1986) ("[I]f the witness is or might be available for recall and the opposing party simply fails to recall him, there has been a sufficient opportunity to explain such that the extrinsic evidence should be admitted under Rule 613 (b). Therefore, one key to the admissibility of the extrinsic evidence of the prior inconsistent statement is the availability of the witness for recall." (emphasis omitted)); *Hood v. State*, 299 Ga. 95, 98-99 (2) (786 SE2d 648) (2016) ("On the issue of admitting extrinsic evidence of a witness's prior inconsistent statement, OCGA § 24-6-613 (b) substantially adopted the language of Federal Rule of Evidence 613 (b) as it read in 2011; to the extent the new Georgia evidence rules borrow from the text of the federal evidence rules in this way, we look for guidance to the decisions of federal appellate courts, particularly the Eleventh Circuit, interpreting the federal rules.").

4. Sconyers contends that the trial court erred by permitting the prosecution to impeach Finch with alleged bias through the testimony of Leslie Morgan, who was the guardian ad litem appointed in Finch's case in juvenile court involving her daughter's

custody and visitation. We see no error.

During her direct examination, Finch testified that her daughter had not been in her custody since Lincoln's death and that she was not offered any opportunity to be able to see her daughter on a more regular basis, nor any type of visitation by the juvenile court. Morgan later testified that Finch was offered the opportunity to have a visitation plan with her daughter, but that it was not ever accomplished. Morgan explained that she was part of a conference call with the juvenile court judge and two others, during which an agreement was reached that the child's therapist would help facilitate a supervised visit on the condition that Finch would sign an affidavit that she is no longer seeing or dating Sconyers, but Finch never executed the affidavit. On cross-examination, Morgan agreed that neither Finch nor her attorney was on the conference call, but she named someone from the office of Finch's attorney as being on the call. Although Finch was aware that there was going to be a conference call addressing visitation, Morgan was not sure what Finch's attorney told her after the call.

Sconyers objects to Morgan's testimony on two bases. First, he contends that her testimony was not based on personal knowledge and therefore was not admissible under OCGA § 24-6-602 ("Rule 602"). Second, he contends that her testimony did not establish a specific instance of Finch's conduct showing that she was biased in favor of Sconyers, and therefore was not admissible to show her character for untruthfulness under OCGA § 24-6-608 (b) ("Rule 608 (b)"). Because Sconyers raised only the Rule 608 (b) objection at trial, we review his Rule 602 argument only for plain error. See OCGA § 24-1-103 (a) (1); *Henderson*, 317 Ga. at 78 (4) (c).[8] We address the arguments in turn.

(a) Rule 602 generally prohibits a witness from testifying "to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of such matter. Evidence to prove personal knowledge may, but need not, consist of the

---

[8] See also *Brown v. State*, 314 Ga. 193, 199 (3) (875 SE2d 784) (2022) (Because the appellant did not object to certain testimony on the ground that the witnesses lacked personal knowledge so as to preserve ordinary appellate review on that issue, it could be reviewed only for plain error.).

witness's own testimony." Under that rule, as under the corresponding federal rule, "witnesses may testify about events they personally observed." *Draughn v. State*, 311 Ga. 378, 385 (4) (858 SE2d 8) (2021). But "a court should exclude testimony for lack of personal knowledge if the witness could not have actually perceived or observed that which he testifies to." *Kirby v. State*, 304 Ga. 472, 478 (3) (b) (819 SE2d 468) (2018) (citation and punctuation omitted).

Morgan's testimony made clear the limit of her personal knowledge, i.e., that her knowledge of Finch's unfulfilled opportunity for a visitation plan with her daughter was based entirely on a conference call in which someone from the office of Finch's attorney participated. Morgan did not state an opinion or inference about Finch's knowledge or actions. To the contrary, Morgan's testimony was "not impermissible opinion testimony" but was "straightforward factual testimony regarding matters within [her] personal knowledge," *Cooper v. State*, 317 Ga. 676, 685 (2) (895 SE2d 285) (2023), only about what she "actually perceived," *Kirby*, 304 Ga. at 478 (3) (b). Thus, we see no violation of Rule 602, much

27

less a violation that is obvious beyond reasonable dispute.

(b) Rule 608 (b) generally prohibits proof by extrinsic evidence of "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness," except for a conviction of a crime as provided in OCGA § 24-6-609 or "conduct indicative of the witness's bias toward a party." Sconyers's argument about what Morgan's testimony proved goes to its relevance to meet the exception in Rule 608 (b) for "conduct indicative of the witness's bias toward a party." The value of Morgan's testimony lay in its tendency both to disprove Finch's testimony denying any offer or opportunity for visitation and to prove bias on her part in favor of Sconyers. See OCGA § 24-4-401 ("Rule 401") (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Morgan's testimony — that Finch knew about the conference call and her attorney had a representative on the call — permitted the natural, reasonable

inference that Morgan accurately reported the substance of the conference call in which she participated in her official role as guardian ad litem, that Finch's attorney performed her duty to ascertain what happened on the call and inform Finch of the visitation offer, and that Finch therefore was offered and declined a visitation plan if she stopped seeing Sconyers. In other words, Morgan's testimony established that — contrary to Finch's own testimony — Finch *was* offered a visitation plan with her older daughter, but declined to go along with that plan because it required her to stop seeing Sconyers. See *Fitts v. State*, 312 Ga. 134, 142 (3) (859 SE2d 79) (2021) ("When considering circumstantial evidence, jurors are entitled to draw reasonable inferences based on their own common-sense understanding of the world that are ordinarily drawn by ordinary people in the light of their experience in everyday life." (citation and punctuation omitted)).

In its ruling, the trial court properly relied on OCGA § 24-6-621 ("Rule 621"), which provides that "[a] witness may be impeached by disproving the facts testified to by the witness." It is true that

29

this statute does not authorize the use of "extrinsic evidence to impeach a witness by contradiction" on a matter that is "wholly immaterial" or "purely collateral" to the material issues at trial. *Scott v. State*, 309 Ga. 764, 770-771 (3) (c) (848 SE2d 448) (2020).[9] But the nature and depth of Finch's relationship with Sconyers was relevant to the jury's assessment of the material issue of her potential bias. See *McNabb v. State*, 313 Ga. 701, 715 (2) (b) (i) (872 SE2d 251) (2022) ("[T]he nature of the relationships between the witnesses and defendants was relevant, as the jury's understanding of a familial relationship between a defendant and a witness could affect the jury's assessment of the witness's credibility or potential bias and provide context for the witness's testimony.").[10] Consequently, it was within the trial court's discretion to admit

---

[9] *Scott* properly relied on case law under former OCGA § 24-9-82, in addition to current Rule 621, because that current rule was carried over from the old Evidence Code and has no federal corollary.

[10] See also OCGA § 24-6-622 ("Rule 622") ("The state of a witness's feelings towards the parties and the witness's relationship to the parties may always be proved for the consideration of the jury."); *Virger v. State*, 305 Ga. 281, 295 (7) (c) (824 SE2d 346) (2019) (holding under Rule 622 that evidence of a prior statement by a girlfriend of the defendant to a detective was admissible to show that her testimony, which was beneficial to the defendant, may have been motivated by bias in his favor).

Morgan's testimony "as a relevant contradictory statement." See *Corley v. State*, 308 Ga. 321, 325 (3) (840 SE2d 391) (2020) ("[I]t is within a trial court's discretion to determine if a party is improperly attempting to use extrinsic evidence to impeach a witness by contradiction under [Rule 621] on a matter collateral to the relevant issues at trial.").

Accordingly, the trial court did not err by allowing the State to impeach Finch with the extrinsic evidence of Morgan's testimony that both contradicted Finch's testimony about visitation and showed a bias on the part of Finch in favor of Sconyers.

*Judgment affirmed. All the Justices concur.*

Decided April 30, 2024.

Murder. Columbia Superior Court. Before Judge Padgett.

*Garland Samuel & Loeb, Donald F. Samuel*, for appellant.

*Bobby L. Christine, District Attorney, Kevin R. Majeska, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Meghan H. Hill, Senior Assistant Attorneys General, Matthew B. Crowder, Assistant Attorney General*, for appellee.