317 Ga. 880
FINAL COPY

S23A1097. LEE v. THE STATE.

McMillian, Justice.

After committing a series of crimes from December 15, 2011, through January 19, 2012, Appellant Edward Lee was convicted of malice murder related to the shooting death of Charlie Artis, as well as multiple other crimes against other victims.[1] On appeal, Lee

---

[1] On January 20, 2015, a Muscogee County grand jury indicted Lee, along with Danteviouse Doleman and Demetrice Scott, on a 21-count indictment. The indictment charged Lee with malice murder (Count 10), two counts of felony murder (Counts 11 and 13), two counts of armed robbery of Julane Fleming and Artis (Counts 3 and 12), three counts of possession of a firearm during the commission of a felony (Counts 4, 7, and 15), criminal attempt to commit armed robbery of Surendrakumar Patel (Count 5), three counts of aggravated assault of Patel, Artis, and R. L. (Counts 6, 14, and 18), two counts of burglary (Counts 16 and 17), and theft by taking (Count 21). Scott was charged individually with raping R. L. Scott pleaded guilty, and a jury found Lee and Doleman guilty of all the charges against them following a joint trial from May 9 through 24, 2016. The trial court sentenced Lee to life in prison without parole for malice murder, a consecutive life sentence for one of the armed robbery counts, consecutive sentences of five years to serve for each of the firearm counts, and multiple concurrent sentences of various terms for the remaining convictions, with the felony murder counts being vacated by operation of law, and the aggravated assault count pertaining to Artis being merged for sentencing purposes.

Lee filed a timely motion for new trial on May 25, 2016, which was amended by new counsel on October 14, 2020. Following a hearing on October

argues that the trial court abused its discretion in denying his motions for a mistrial on the grounds that (1) his co-indictee Demetrice Scott, who testified at trial for the State as part of his plea agreement, made reference during his testimony to Lee's prior incarceration, and (2) the State violated *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963), by failing to disclose evidence from Lee regarding a fourth man who rode with the co-indictees to the barbershop where Artis was murdered. Lee also argues that his trial counsel rendered ineffective assistance by failing to object during the State's closing argument on the grounds that the prosecutor commented on the veracity of witnesses and argued facts not in evidence. For the reasons that follow, we affirm.

Viewed in the light most favorable to the jury's verdict, the evidence at trial showed that Lee, Doleman, and Scott participated in a crime spree from December 15, 2011, through January 19, 2012.

---

13, 2021, the trial court denied Lee's motion for new trial, as amended, on April 4, 2022. Lee filed a timely notice of appeal on April 6, 2022, and the case was docketed to the August 2023 term of this Court and submitted for a decision on the briefs.

On December 15, 2011, they robbed Julane Fleming at gunpoint and stole her Lexus. On December 20, 2011, they attempted to rob Surendrakumar Patel at the Hometown Grocery Store, where Lee shot at Patel twice. On January 5, 2012, they rode together to a barbershop where Lee robbed Artis before shooting and killing him. On January 11, 2012, they burglarized Felicia Scott's home. On January 15, 2012, they burglarized the residence of R. L., and Lee stole R. L.'s car. On January 19, 2012, they stole an Xbox, a controller, and games from the home of Joshua Myers.

According to Scott, the co-indictees' crime spree began when they drove together to an apartment complex where they saw a woman getting in her Lexus. Lee ran up to the woman with his gun drawn, and when she jumped out of her car and fled, Lee took her car and drove away while Doleman and Scott rode away separately. The woman, Fleming, testified at trial that as she started to back her car out of its parking space, a man appeared, pointed a gun at her, and told her to get out, which she did.

Scott's cousin, Karen Gibson, had a relationship with both Lee

3

and Doleman, and the three men began living at her home in late 2011. Gibson testified at trial that one evening, she heard Lee, Doleman, and Scott talking about robbing the Hometown Grocery Store. Scott testified that the three men rode together to the grocery store, where he and Lee lay in wait for the owner to come out with a money pouch after closing the store. According to Scott, when Patel exited the store and began to get into his vehicle, Lee and Scott approached him as Lee pointed a .32-caliber revolver at Patel, but Patel got in his vehicle anyway and drove away as Lee fired shots at him. Patel testified that after he closed the store that night and was getting into his vehicle, a man approached him and started shooting at him as he drove away.

Scott testified that he knew Artis, had been to his barbershop a few times, and knew Artis kept a lot of cash on his person. Scott told Lee and Doleman about Artis and the cash he kept, and they decided to rob him. Scott testified that the plan was for Lee to rob Artis, that Lee had a .38-caliber revolver that day, that Scott drove them in a green car, and that on the way, they picked up a fourth

4

man named Chris, who was a friend of Lee and Doleman. Scott dropped off Lee near the barbershop, and Chris also got out of the car. According to Scott, Lee was wearing a blue fleece jacket at the time. Scott and Doleman parked in a nearby apartment complex, and afterward, Lee came running back to the car breathing hard, got in, and told them to go. Chris also got back in the car. Unbeknownst to the others, Artis had been shot during the robbery. When Scott asked Lee what he got from robbing Artis, Lee said that he had not gotten anything. Scott testified that he only found out later that Artis was killed and that Lee was "telling folks" that Lee had killed Artis, but Lee would get mad at Scott whenever Scott asked about it.

A number of witnesses in the area of the shooting testified to the surrounding circumstances. Denise West testified that on the day of Artis's murder, she went to a salon that was near Artis's barbershop. As she drove up, she saw Artis standing in front of the barbershop talking to a man wearing a blue jacket. After she walked into the salon, she heard what sounded like a gunshot and then saw

5

Artis lying on the ground outside as the man wearing the blue jacket ran away. Brandon Holland testified that he was behind the barbershop smoking marijuana when he heard a gunshot and then saw a man wearing a blue hoodie running away. Undrea Jones, who was doing maintenance work at the nearby apartment complex, testified that on his way back to work after lunch, he drove through the plaza where the barbershop was located and saw a green car with four men in it "creeping" along by the barbershop and looking toward it. When Jones got back to the apartment complex where he was working, he saw the same men drive onto the property where one of them, who was wearing a blue jacket, got out and cut through a pathway that led back to the plaza where the barbershop was located. Darien Floyd, who was a regular customer at Artis's barbershop, testified that he went there to get a haircut that day and when he arrived, the only people he saw in the parking lot were Artis and a man wearing a blue hoodie. Floyd then entered the barbershop to get a haircut from one of Artis's employees, and although he never heard a gunshot, he noticed police arrive and he

6

then came outside and saw Artis on the ground lying in a pool of blood. Floyd later identified Lee from a photo lineup as resembling the man he saw in the blue hoodie. Darrell Dague, who lived in the nearby apartment complex, testified that he heard what sounded like gunshots coming from the plaza and then heard something crashing through the woods before he saw a man wearing a blue hoodie running out of the woods. Dague asked the man if he needed help, and the man responded that someone had been shot. And although Dague failed to identify Lee from the first photo lineup he was shown after the incident, later during the investigation, he identified Lee from another photo lineup as the man he saw in the blue hoodie, stating that he was "100 percent sure" about it. Antonio Jamerson, who was a roadside assistance technician, was also at the nearby apartment complex trying to jump-start a woman's car when he heard a voice say that someone had been shot and then saw a young man in a blue jacket running away. Jamerson later identified Lee from a photo lineup as resembling the man he saw wearing blue that day. After Artis was killed, no cash was discovered on his

person. An autopsy determined that Artis died from a single gunshot to the chest.

Scott testified that on a later occasion, he, Lee, and Doleman entered Felicia Scott's house through an open window and stole multiple items. Felicia testified that when she got home that day, she found her house ransacked, with multiple items missing.

Scott also testified that on the night of January 15, 2012, he and Lee were armed with .32- and .38-caliber guns, and he entered R. L.'s residence through the window, held her at gunpoint, and then let Lee and Doleman in through the door. After Lee and Doleman stole R. L.'s car keys, the three left. R. L. testified that she was home in her bathrobe when she heard something in the kitchen, and when she opened the kitchen door, she saw a man who pulled a gun on her. He forced her back into her bedroom and onto the floor at gunpoint. She could hear the man open her back door and then heard the voices of at least two other people. The first man then held her at gunpoint while she listened as the other men plundered her home. Gibson testified that she later heard the co-indictees talking

8

and joking about their robbery of R. L.

Joshua Myers testified that on January 19, 2012, after he had a disagreement with Lee, Doleman, and Scott about payment for some tattoo work he had begun for them, they stole an Xbox, along with a controller and games, from his home. Myers called the police to report the theft and told officers where they could find the three men. When officers arrived at the residence where the three men lived, officers stationed themselves at the front and back doors, and when they knocked and announced their presence, they saw several men trying to run out of the back door and windows before going back inside when officers yelled at them to stop. Officers continued to knock, and Gibson opened the door and said that no one else was inside. While officers spoke to Gibson, Scott appeared and said he was the only other person in the residence. Scott denied having an Xbox and offered to show them his bedroom, where they saw an Xbox controller under the bed. They took Scott into custody, and Gibson then signed a consent form for a search of the residence. Officers searched the home and found Lee and Doleman hiding in a different

9

bedroom; officers took them into custody as well. Officers also found the Xbox, a .38-caliber revolver with all the rounds inside fired, and a loaded magazine for a .32-caliber gun, and the police investigation revealed evidence that all three men participated in the crime spree that led up to their arrests. Although a firearms examiner testified that her comparison of the .38-caliber bullet that was recovered from Artis's body with the .38-caliber revolver recovered from the co-indictees' residence was inconclusive, she could not eliminate the .38-caliber revolver recovered from the co-indictees' residence as the gun that fired that bullet.

1.    Lee contends that the trial court abused its discretion in denying his motions for a mistrial on the grounds (a) that Scott said during trial that he was incarcerated with Lee, and (b) that the State violated *Brady* by presenting evidence at trial, through Scott's testimony, of a fourth person named Chris who was present with the co-indictees at the time of Artis's murder. But because Lee did not move for a mistrial on either ground contemporaneously with the presentation of the testimony at issue, these issues are waived for

10

the purposes of appeal.

(a)   With regard to the mention of Lee's prior incarceration, the record shows that Lee moved before trial to prevent any mention by prosecutors of his criminal history, and the State responded that it did not plan to bring up that Lee was a convicted felon unless he elected to testify. During Scott's direct examination, which took place on a Friday, when the prosecutor asked if he knew Lee, Scott responded that he knew Lee from being incarcerated with him in 2011. Despite what appeared to be—and what Lee's counsel agreed was—the prosecutor's attempts to steer Scott away from the subject, Scott mentioned twice more being previously incarcerated with Lee before Lee's counsel requested a bench conference and complained about those references. The court had Scott briefly escorted out of the courtroom so that the attorneys could instruct him outside the presence of the jury to avoid further reference to Lee's prior incarceration. Scott then returned to the courtroom, his direct examination was completed, and court was adjourned for the weekend. Lee did not move for a mistrial at that time.

When court reconvened on Monday morning, Lee moved for a mistrial based on Scott's references to Lee's prior incarceration. After hearing argument, the court took the matter under advisement and reserved ruling until the conclusion of the rest of Scott's testimony that afternoon. The next morning of the trial, the court denied the motion for a mistrial.

It is well established that a motion for a mistrial "must be promptly made as soon as the party is aware of the matter giving rise to the motion," so "[i]f the defendant did not make a contemporaneous motion for a mistrial at the time the defendant became aware of the matter giving rise to the motion, then the defendant has waived review of this issue on appeal." *Neloms v. State*, 313 Ga. 781, 785 (2) (873 SE2d 125) (2022) (citation and punctuation omitted). Because Lee did not move for a mistrial based on Scott mentioning Lee's prior incarceration contemporaneously with the presentation of that evidence, but instead waited until the following day of trial—after Scott's direct examination concluded and the Court recessed for the weekend—this issue was waived for

12

the purposes of appeal. See, e.g., *Goins v. State*, 310 Ga. 199, 206 (5) (850 SE2d 68) (2020) (holding that mistrial issue was not preserved for appellate review because defendant did not move for mistrial based on mention of defendant's prior incarceration until the jury was released for a lunch break following further testimony); *Kilpatrick v. State*, 308 Ga. 194, 199-200 (5) (839 SE2d 551) (2020) (holding that mistrial issue was not preserved for appellate review because defendant did not move for mistrial based on improper character evidence "until *after* the transcript of the specific phone call [at issue] had been admitted at trial, and *after* the investigator testified about how the call fit into the overall timing of events") (emphasis in original).

(b) In regard to the alleged *Brady* issue, on the same Friday that Scott mentioned Lee's prior incarceration, Scott also testified on direct examination that he, Lee, and Doleman picked up a man named Chris, who was a friend of Lee and Doleman, while they were on their way to the barbershop where Lee shot and killed Artis. At that point, Doleman's counsel requested a bench conference and

asked when the prosecutor had learned about Chris. The prosecutor responded that he knew there was a fourth person but that he had just learned the name Chris, and the trial court added that there had already been other testimony from another witness that four people were in the car. Lee did not move for a mistrial at that time. After a bit more discussion, the court said "let's get the direct testimony in. Then we'll discuss this when we let the jury go," at which point the bench conference concluded and the direct examination of Scott continued. After the conclusion of Scott's direct examination, the court sent the jury out and discussed the issue further with counsel. The prosecutor maintained that he had only learned the name "Chris" that day and that he knew nothing else about Chris's identity. Scott, who remained in the courtroom, also said that he knew nothing else about who Chris was or where he could be found. Scott also said "I did not tell him [the prosecutor] about the fourth person until today." Lee still did not make a mistrial motion at that time. After these discussions, the court advised that it would send the jury home for the weekend and not

14

have them return until Monday afternoon so that defense counsel had time to speak with Scott and "avail [themselves] of every opportunity to explore this area further."

When court reconvened on Monday morning, Lee moved for a mistrial also on the ground that the State had engaged in prosecutorial misconduct by failing to disclose evidence favorable to the defendants—namely, information pertaining to Scott's testimony that a man named Chris rode with the co-indictees to the barbershop on the day of Artis's murder. The trial court denied the motion for mistrial on that ground at the same time that it denied the motion based on mention of Lee's prior incarceration.

This mistrial issue was also waived for the purposes of appeal because Lee did not move for a mistrial based on Scott's testimony about Chris's presence with the co-indictees at the time of Artis's murder contemporaneously with the presentation of that evidence. Lee did not move for a mistrial on that ground when Scott testified about Chris during his direct examination, nor did Lee move for a mistrial on that ground at the conclusion of Scott's direct

15

examination when the matter was discussed further. Instead, Lee waited until after the court adjourned for the day, only moving for a mistrial the following day of trial. See, e.g., *Neloms*, 313 Ga. at 785 (2) (holding that mistrial issue was not preserved for appellate review because despite making a timely objection, defendant "did not move for a mistrial at the time of the prosecutor's alleged misconduct"); *Keller v. State*, 308 Ga. 492, 501-02 (4) (842 SE2d 22) (2020) (holding that mistrial issue was not preserved for appellate review because despite making an objection that a copy of the warrant was never provided to him, defendant "waited to move for a mistrial until well into the next day's proceedings"). Accordingly, both enumerations of error concerning the mistrial issues have been waived for appellate review.

2.    Lee also contends that his trial counsel rendered ineffective assistance by failing to object during the State's closing argument on the grounds that the prosecutor commented on the veracity of witnesses and argued facts not in evidence. We are not persuaded.

To succeed on a claim of ineffective assistance of counsel, Lee must show both that his counsel's performance was deficient and that such deficiency prejudiced his defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To satisfy the deficiency prong, Lee must demonstrate that his counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Bacon v. State*, 316 Ga. 234, 239 (3) (887 SE2d 263) (2023) (citation and punctuation omitted). In doing so, Lee must overcome "[a] strong presumption . . . that trial counsel's performance was reasonable and that counsel's decisions and choices at trial fell within the broad range of professional conduct as assessed from counsel's perspective at the time of trial and under the specific circumstances of the case." Id. (citation and punctuation omitted). To establish prejudice, Lee "must prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different." *Bates v. State*, 313 Ga. 57, 62 (2) (867 SE2d 140) (2022). And if Lee fails to make a sufficient

showing on either the deficiency or the prejudice prong, we need not address the other prong. See *Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 132) (2022).

Lee contends that by arguing during closing that neither Floyd nor Dague had any reason to lie or to identify the wrong person as the man they saw near the barbershop at the time of Artis's murder, the prosecutor was arguing that they must have been telling the truth, which Lee contends was improper commentary on the veracity of witnesses. Lee also takes issue with the prosecutor's statements during closing that "it's quite possible that this Chris, if he exists, was also the one who provided the green car, the smoke car, if you will," and that perhaps Scott could not testify about any money that came from the robbery of Artis "because Edward Lee wanted to keep it for himself. And it's possible that after they got back to their house, he split it up with Danteviouse Doleman"— statements that Lee contends were unsupported speculation and therefore improper argument concerning facts not in evidence. Lee argues that his trial counsel should have objected to all of these

18

statements, and Lee points out that at the hearing on his motion for new trial, his trial counsel testified that she thought she should have objected and she offered no explanation for why she did not.

But "[a] closing argument is to be judged in the context in which it is made," *Styles v. State*, 308 Ga. 624, 629 (3) (842 SE2d 869) (2020) (citation and punctuation omitted), and "[a] prosecutor is granted wide latitude in the conduct of closing argument and within the scope of such latitude is the prosecutor's ability to argue reasonable inferences from the evidence, including any that address the credibility of witnesses," *Jackson v. State*, 301 Ga. 774, 775 (3) (804 SE2d 73) (2017) (citation and punctuation omitted). Moreover, "[w]hether to object to a particular part of a prosecutor's closing argument is a tactical decision, and counsel's decision not to make an objection must be patently unreasonable to rise to the level of deficient performance." *Cochran v. State*, 305 Ga. 827, 833 (2) (d) (828 SE2d 338) (2019).

By urging the jury to believe Floyd's and Dague's identification of Lee because they had no reason to lie or identify the wrong person,

the prosecutor's statements were "permissible since they were the conclusion the prosecutor wished the jury to draw from the evidence and not [ ] statement[s] of the prosecutor's personal belief as to the veracity of [the] witness[es]." *Jackson*, 301 Ga. at 775-76 (3) ("While it is improper for counsel to state to the jury counsel's personal belief as to the veracity of a witness[,] it is not improper for counsel to urge the jury to draw such a conclusion from the evidence." (citation and punctuation omitted)). Likewise, the prosecutor's other comments about the possibility that Chris may have provided the car used during the murder of Artis or that Lee may have withheld the proceeds of that robbery from Scott were also reasonable inferences based on the evidence presented, especially considering the context and surrounding comments within which they were made. For example, when he argued that Chris may have provided the car, the prosecutor immediately noted, "You heard testimony that people exchange cars for use in exchange for marijuana or crack," and when he argued that Lee may have withheld the robbery proceeds from Scott, the prosecutor immediately noted, "Remember the evidence

20

that these two guys [Lee and Doleman] grew up in East Highland together and these two guys are best friends. . . . And remember Demetrice Scott is the outsider"—both of which referenced evidence presented at trial from which the complained-of statements reasonably could be inferred given the prosecutor's wide latitude to draw such inferences during closing argument. See, e.g., *Blocker v. State*, 316 Ga. 568, 580 (4) (a) (889 SE2d 824) (2023); *Ridley v. State*, 315 Ga. 452, 458-59 (4) (b) (883 SE2d 357) (2023); *Calhoun v. State*, 308 Ga. 146, 151-52 (2) (b) (839 SE2d 612) (2020). Moreover, trial counsel's testimony that she thought she should have objected "is of no consequence to our assessment" because "hindsight has no place in an assessment of the performance of trial counsel," as the proper assessment is "an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Hartsfield v. State*, 294 Ga. 883, 888 (3) (b) (757 SE2d 90) (2014) (citations and punctuation omitted).

Because all of the prosecutor's comments about which Lee complains were within the wide latitude afforded the State during

21

closing argument, any objection would have been meritless, and "the failure to make a meritless objection is not deficient performance." *Smith v. State*, 315 Ga. 357, 367 (5) (b) (882 SE2d 289) (2022). Accordingly, this enumeration of error also fails.

*Judgment affirmed. All the Justices concur.*

Decided December 19, 2023.

Murder. Muscogee Superior Court. Before Judge Smith.

*Stanley W. Schoolcraft III*, for appellant.

*Stacey S. Jackson, District Attorney, Cynthia D. McDonald, Tina G. Stanford, Frederick Lewis, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Meghan H. Hill, Senior Assistant Attorneys General, Matthew B. Crowder, Assistant Attorney General*, for appellee.