NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the
# Supreme Court of Georgia

No. S26A0017
Vincent Almond
v.
The State

On Appeal from the Superior Court of DeKalb County
No. 21CR1610

Decided: June 2, 2026

LaGrua, Justice.

Appellant Vincent Almond challenges his 2023 convictions for malice murder and possession of a firearm during the commission of a felony in connection with the shooting death of his grandfather Henry Benton.[1] Almond contends that (1) the trial court abused its discretion in ordering that Almond be shackled during trial; (2) the trial court committed plain error by

---

[1] The crimes occurred on August 29, 2020. On June 1, 2021, a DeKalb County grand jury indicted Almond for malice murder, felony murder, aggravated assault with a deadly weapon, and possession of a firearm during the commission of a felony. At a trial from April 10 to 14, 2023, the jury found Almond guilty of all charges. The trial court sentenced Almond to serve life in prison with the possibility of parole for malice murder and a consecutive term of five years for the firearm possession charge. The other counts merged or were vacated by operation of law. On May 10, 2023, Almond filed a motion for new trial, which he amended with new counsel on December 20, 2024. After an evidentiary hearing on March 14, 2025, the trial court entered an order denying the motion on May 13, 2025. Almond filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2025 and submitted for a decision on the briefs.

allowing the State to introduce an in-life photograph of Benton through Benton's daughter; (3) the prosecutor made improper comments during closing arguments; (4) and trial counsel was ineffective in not objecting to the in-life photograph and in not objecting to comments made by the prosecutor in closing argument. These arguments are unavailing, and thus, we affirm.

Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following: In August 2020, Almond was living with his mother Teresa Almond at her house in DeKalb County because he had recently lost his job and could not afford to live on his own. Although Teresa and Almond had a good relationship, Teresa noticed changes in Almond's behavior after he moved in with her, including talking to himself and having "outbursts."

On August 29, 2020, Almond's nine-year-old daughter, who lived with her mother, was at Teresa's house visiting Almond. Almond believed that his daughter had taken some money from him, and he "had a little outburst." Almond was "talking loud" and "was all in [his daughter's] face." According to Teresa, the outburst was "very scary." After yelling at his daughter, Almond went to his bedroom. Teresa called 911, asking officers to come pick up Almond.

Teresa also called her parents, and Benton, Teresa's father, and Fannie Benton, Teresa's mother, came over to her house. When Benton and Fannie arrived, Benton went to Almond's bedroom to talk to him, and soon thereafter, Teresa and Fannie heard loud voices coming from Almond's room. When Teresa and Fannie entered Almond's bedroom, Teresa saw Almond and Benton "in each other's face." Fannie saw Benton and Almond reaching down toward the bed, and then she saw Almond get up holding a gun and then point it at Benton. Fannie hit Almond

2

with her cane and said, "Don't do it" or "Don't shoot. Don't shoot." Almond fired a single shot, hitting Benton in the center of his chest. After shooting Benton, Almond said, "y'all was trying to kill me." Almond walked out of the room and put the gun on top of a kitchen cabinet. The gun was a Zastava "black and wooden" gun that belonged to Almond's older brother and was kept on an upper shelf in Teresa's bedroom closet; Teresa was not aware that Almond had taken the gun out of the closet.

After the shooting, Teresa called 911 again, and when officers arrived in response to Teresa's 911 call, they began CPR on Benton until paramedics arrived. Benton was transported to the hospital, where he died from the single gunshot wound. A GBI firearms examiner testified that to disengage the safety on the gun required "a little pressure" because "you can't just, like, flip it," but had to put "a little elbow grease behind it" and that disengaging it was different from a handgun safety. The trigger pull was six pounds.

At trial, Almond testified that he was in the kitchen and reprimanded his daughter for taking his money and that Teresa told him to lower his voice. Almond left the kitchen and went to his room. Benton came into the room a little while later. Benton had a "normal demeanor" at first but then "it kind of shifted to him telling me that I had to leave." Benton was standing over Almond as Almond sat on the foot of the bed. Almond said he wasn't leaving, and Benton "started getting loud," but Almond did not raise his voice. Almond testified, "I try to stand because I want some distance. And as I stood up it was kind of a push backwards and I wind up going around the side of the bed." Almond said that there was a "tussle" and that Benton, who was "physically fit," "put his hands on [him], but he did not "put [his] hands on [Benton]." Almond explained that he was going to the side of the

3

bed, and as he "got closer to the nightstand, it was as if [Benton] was choking me"; "his hands were locked around my neck. I was trying to break free from him," but "he was trying to force me back down."

According to Almond, Teresa and Fannie ran into the room, and Fannie "immediately hit [him] with her cane." Almond was backed into the corner of the room, next to the bed, and the gun was on the bed, partially covered. Almond reached for the gun because he did not want his family using it against him, and then, "in a split second," there "was like a race" for the gun between him and Benton, and "we kind of tussled back and forth with it." Almond also said, "I want to say my mother was involved too," and "[a]fter we tussled with it, it immediately went off." According to Almond, Benton was about a foot or two away from him when the gun went off. When asked if he knew if he had his finger on the trigger, Almond responded, "Honestly, I don't know."

Almond claimed that he had gotten the gun from his mother's closet the day before after he had "perceived" someone take something out of the mailbox, "so [he] didn't want that situation to escalate to them folks trying to come into the house." Almond said that he had never tried to operate the safety, and, in fact, was not familiar with the gun, had never loaded it, did not have any ammunition for it, and did not even know if it was loaded or not.

Portions of Almond's audio-recorded, custodial statement were played at trial during the State's cross-examination of him.[2] In his statement, Almond said it took a couple of times to "knock"

---

[2] At a pretrial hearing on the first day of trial, the State presented evidence that Almond had waived his rights under *Miranda v. Arizona*, 384 US 436 (1966), and the trial court determined that Almond made the statement freely and voluntarily.

4

the safety off the gun. On redirect, Almond explained his statement about the safety by saying, "I know the safety is on, so in the midst of it, I guess, [Benton] hitting me and we tussling for it, it had to take power for me to hit the safety off."

1. Almond contends the trial court abused its discretion in ordering that he be shackled over his objection, without considering any special circumstances that would have warranted shackling, and without giving particularized reasons as to why the shackling was required. While we have concerns about the shackling of Almond under these particular circumstances, we see no reversible error.

On the first day of trial, Almond's trial counsel objected that Almond was "wearing leg irons" and asked that they be removed. Trial counsel argued that it was a "due process violation" to require shackling where there was no indication that Almond would be a threat to anyone in the courtroom. The trial court summarily denied the request, without giving any explanation at all about the necessity for the enhanced security measure.

As we have recently reiterated, shackling should occur "as a last resort." *Kam v. State*, slip op. S26A0215 at 17 (May 19, 2026). To ensure that shackling does not occur as a routine practice, we have said that a trial court should require shackling only after considering any case-specific security concerns and any less restrictive measures available to address those concerns. See *Hill v. State*, 308 Ga. 638, 644 (2020).

However, even assuming that the shackling here was not permissible under our case law, we have said that a new trial is not required if the State overcomes the presumption of harm by demonstrating that the shackling was harmless beyond a reasonable doubt. See *Wallace v. State*, 320 Ga. 272, 283 (2024).

5

In its order denying the motion for new trial, the trial court concluded that the State met its burden of showing that the shackling was harmless beyond a reasonable doubt. Specifically, the trial court found that, although Almond testified at the motion-for-new-trial hearing that "he remembered moving slowly [when he testified at trial] because of the shackles," there was "absolutely no credible evidence that [Almond's] restraints were ever visible to, or viewed by, the jury at any point in time"; that table skirts were draped around the front and sides of the table where Almond was seated, "concealing [Almond's] legs from the view of the jury"; and that Almond was brought into and out of the courtroom while the jury was absent. The trial court further found, as a matter of fact based on its own independent recollection and standard practice, that Almond "did not walk to the witness stand while wearing leg shackles in the presence of the jury" and "was not in handcuffs or leg shackles during his testimony."

Our review of the record shows that the trial court's findings are not clearly erroneous, and we agree that the State has met its burden of demonstrating harmless error. Here, the leg irons were not visible to the jury at any time; there was no evidence in the record that the shackles impaired Almond's ability to confer with his lawyer; and the evidence against Almond was strong and included the eyewitness testimony of Teresa and Fannie. See *Wallace*, 320 at 284–85 (concluding that the State carried its burden of demonstrating harmless error from presumed error in shackling defendant where the shackles were not visible to the jury and the evidence against Wallace was strong). Accordingly, this claim fails.

2. Almond contends that the trial court committed plain error by allowing the prosecutor to introduce into evidence an in-

6

life photograph of Benton through Teresa. The photograph showed Benton, against a neutral background, from the chest up and wearing a cruise line t-shirt. Teresa identified Benton's photograph as a fair and accurate representation of Benton, and there is no indication in the record that Teresa displayed any emotional reaction in doing so. Almond said he had no objections. Because Almond did not object, we review the claim for plain error only.[3] See OCGA § 24-1-103.

To establish plain error, an appellant must show "that an error occurred, was not affirmatively waived, was clear and obvious beyond reasonable dispute, and affected his substantial rights." *Burke v. State*, 320 Ga. 706, 706 (2025). Here, Almond's claim fails because, even if Almond had objected, the trial court was not required to exclude the photograph. We have previously determined that there was no abuse of discretion in the admission of in-life photographs of the victim under similar circumstances. See *Gude v. State*, 313 Ga. 859, 865–66 (2022) (concluding that trial court did not abuse its discretion in admitting single in-life photograph depicting the victim standing alone against a neutral background where the victim's mother's testimony about the photograph was brief and her emotional response when doing so was no greater than similar emotion she displayed at other points in her testimony); *Walker v. State*, 312 Ga. 232, 237–38 (2021) (concluding that trial court did not abuse its discretion in admitting, through a non-family member, a single in-life

---

[3] We have previously said that we review a claim of evidentiary error for plain error even when trial counsel affirmatively states "no objection." See *Crayton v. State*, 298 Ga. 792, 799 (2016) ("Inasmuch as appellant did not object to the admission of this evidence and affirmatively stated he had no objection to the admission of the evidence in question, our review is for plain error under Georgia's new Evidence Code. See OCGA § 24-1-103(d).").

7

photograph of the victim pictured alone). Because the trial court would not have abused its discretion in overruling an objection, Almond has failed to demonstrate that an obvious error occurred. See *Jackson v. State*, S25A1498, slip op. at 13–15 (927 SE2d 266) (Mar. 3, 2026) (concluding that appellant failed to show the existence of an obvious error for purposes of plain error review, where, under our case law, the trial court would not have abused its discretion in excluding the evidence, even if appellant had objected).

3. Almond also raises three claims of ineffectiveness of trial counsel. Prevailing on a claim of ineffective assistance of counsel requires that an appellant prove deficient performance and resulting prejudice. See *Strickland v. Washington*, 466 US 668, 687 (1984). To establish deficient performance, an appellant must overcome the "strong presumption" that trial counsel's performance was reasonable and demonstrate that trial counsel's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in the light of prevailing professional norms. Id. at 688–89. "[D]ecisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Sneed v. State*, slip op. S26A0409 at 6 (2026 WL 1072439 (April 21, 2026) (quotation marks omitted). To establish the required prejudice, Almond must show that, but for his attorney's unprofessional errors, there is a "reasonable probability" that the result of the proceeding would have been different. *Strickland*, 466 US at 694. "If either *Strickland* prong is not met, this Court need not examine the other prong." *Copney v. State*, 322 Ga. 794, 798 (2025) (quotation marks omitted).

(a) Almond first asserts that his trial counsel was deficient

8

in failing to object to the introduction of the in-life photograph of Benton. However, at the hearing on the motion for new trial, Almond did not ask trial counsel why he did not object. And we have said that trial counsel is not deficient for failing to make every conceivable objection. See *Arnold v. State*, 309 Ga. 573, 578–79 (2020) (explaining that trial counsel is not deficient for failing to make every conceivable objection but is "only deficient for failing to lodge those objections that every reasonable attorney would have lodged"). Thus, we cannot say here that trial counsel was deficient in failing to object to the in-life photograph of Benton. See *Glenn v. State*, 296 Ga. 509, 511–12 (2015) (concluding that appellant failed to show that trial counsel was deficient in failing to object to a single in-life photograph identified by the victim's mother where trial counsel did not believe identification was an issue and the focus of the defense was justification).

(b) Almond next contends that his trial counsel was deficient for failing to object during closing arguments to the prosecutor's alleged misstatements of testimony. Specifically, Almond contends that the prosecutor mischaracterized the medical examiner's testimony in arguing that Benton's wound was not a contact wound and mischaracterized the evidence in arguing that Benton was not standing up when he was shot. With respect to both these comments, trial counsel testified at the hearing on the motion for new trial that he did not object because, when he has made similar objections in other cases, "the judge typically says the jury will remember what the evidence was," so he "didn't think that the Court would uphold [his] objection." Under these circumstances, trial counsel's strategic decision to forgo an objection was not patently unreasonable. See *Sneed*, slip op. S26A0409 at 8–10 (concluding that appellant failed to show that trial counsel was deficient in not objecting to prosecutor's

9

comment that allegedly misstated the evidence).

(c) Almond also contends that the prosecutor improperly asserted her personal beliefs about the veracity of Almond and Teresa.[4] In discussing Almond's testimony, the prosecutor stated that Almond "was not lying for once," when he acknowledged on redirect that "I knew the safety was on," which was inconsistent with his testimony on direct that he was not familiar with the gun and had never tried to operate the safety. In discussing Teresa's testimony, the prosecutor stated, "Now, her testimony is worthy of belief. She told you what happened, relived one of the worst days of her life." Immediately after this statement, the prosecutor argued that Teresa's testimony was corroborated by the crime scene photos.

Although Almond failed to ask his trial counsel at the motion for new trial hearing why he did not object to these comments, we conclude that a competent attorney may have reasonably determined that the prosecutor's comments were well within the scope of the wide latitude granted prosecutors to argue reasonable inferences from the evidence, including those that touch on the credibility of witnesses. See *Lee v. State*, 317 Ga. 880, 887–88 (2023) (concluding that trial counsel was not deficient in failing to object to the prosecutor's remarks that were permissible arguments about the conclusion to be drawn from the evidence, rather than statements about the prosecutor's personal belief as to the veracity of witnesses). Thus, Almond has failed to meet his

---

[4] In a separate enumeration of error, Almond asserts that all the prosecutor's comments in closing arguments were improper and require reversal of his convictions. But Almond did not assert any objection to the prosecutor's comments, so he has waived any appellate review of this alleged error. See *Walker*, 312 Ga. at 236–37 (holding that the failure to object to allegedly improper statement in closing argument waives any appellate review of error, including for plain error).

10

burden of showing that his trial counsel was deficient in failing to object to this aspect of the prosecutor's closing argument.

For all these reasons, Almond's claims of ineffective assistance of counsel fail.[5]

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*

---

[5] Almond summarily asserts that reversal is required under *State v. Lane*, 308 Ga. 10, 14 (2020). However, even assuming that a *Lane* cumulative error analysis applies to the one trial court error we have assumed—the shackling of Almond at trial—we also concluded that trial counsel did not perform deficiently in any respect. Accordingly, there is nothing to assess cumulatively, and thus, this claim fails. See *Burke v. State*, 320 Ga. 706, 713 (2025) (concluding that cumulative error claim under *Lane* failed where appellant "failed to establish more than one error at trial").