NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the
# Supreme Court of Georgia

No. S26A0448
Denson
v.
The State

On Appeal from the Superior Court of Fulton County
No. 17SC151173

Decided: June 16, 2026

COLVIN, Justice.

Appellant Travis Denson appeals his convictions for felony murder and related offenses in connection with the shooting death of Horace Gene Fendley.[1] On appeal, Appellant argues that

---

[1] The shooting occurred on January 13, 2017. On April 14, 2017, a Fulton County grand jury indicted Appellant for malice murder (Count 1), felony murder predicated on aggravated assault with a deadly weapon (Count 2), felony murder predicated on possession of a firearm by a felony first-offender probationer (Count 3), aggravated assault with a deadly weapon (Count 4), possession of a firearm during the commission of a felony (Count 5), and possession of a firearm by a first-offender probationer (Count 6). A jury trial was held from April 23 through 26, 2018. The jury found Appellant guilty of involuntary manslaughter as a lesser offense of malice murder, and the jury also found Appellant guilty of the remaining counts. The trial court sentenced Appellant to life in prison for Count 3 (felony murder predicated on possession of a firearm by a felony first-offender probationer) and imposed a 20-year concurrent prison sentence for Count 4 (aggravated assault with a deadly weapon) and a five-year consecutive prison sentence for Count 5 (possession of a firearm during the commission of a felony). The trial court vacated by operation of law Count 1 (involuntary manslaughter as a lesser offense of malice murder) and

his trial counsel was constitutionally ineffective for failing to object to certain statements made by the prosecutor in closing arguments and that the trial court erred in sentencing him for felony murder predicated on possession of a firearm by a felony first-offender probationer rather than for involuntary manslaughter. For the reasons explained below, we affirm Appellant's convictions.

1. The trial evidence showed the following. In January 2017, Appellant lived in a house in Fulton County with his long-term partner, Janice Rainwater. Appellant and Rainwater spent their days "scrapping" metal with Fendley, Appellant's friend whose father lived in the neighborhood. And Fendley sometimes stayed overnight at the couple's house.

The shooting occurred at Appellant and Rainwater's house on the night of January 13, after Appellant, Fendley, and Rainwater had spent the day "scrapping" and drinking alcohol. Rainwater testified that they returned to Appellant and Rainwater's house around 5:00 or 6:00 that evening, that she then went inside the house, that Appellant and Fendley stayed outside in Appellant's truck, and that Appellant did not come back inside the house for a couple hours.

Appellant said that he and Fendley were drinking beer and that, at some point, they went to the liquor store to buy more

Count 2 (felony murder). Finally, the court merged for sentencing purposes Count 6 (possession of a firearm by a first-offender probationer) with Count 3 (felony murder predicated on possession of a firearm by a felony first-offender probationer). Appellant timely filed a motion for new trial on May 8, 2018, and amended the motion through new counsel on September 21, 2022, and January 4, 2023. Following a hearing, the trial court denied Appellant's motion for new trial on October 21, 2024. Appellant timely filed a notice of appeal directed to this Court. The case was docketed to this Court's term beginning in December 2025 and submitted for a decision on the briefs.

beer.[2] When Appellant and Fendley got back to the house, Rainwater was inside the house on one of the two couches near the front door. Appellant said that he laid down on the other couch and told Fendley that he was welcome to sit down, but that if he left the house, he could not return that night. Fendley chose to leave. And according to Appellant, who said he was drunk and tired, he then fell asleep on the couch.

Appellant said that, later, he heard someone banging on the front door, which was locked. He asked who was there, and Fendley identified himself. Rainwater testified that Fendley asked to be let inside, but that Appellant declined the request, saying he "want[ed] to be with [his] wife." According to Rainwater, Fendley started "getting a little bit aggressive," insisting that Appellant let him inside. And in response, Appellant said that Fendley could not come in and that he needed to "get off [Appellant's] porch" and go away. Rainwater testified that Fendley then started "jerking the door knob" while saying, "Let me in; let me in; let me in." But Appellant continued to insist that Fendley leave.

Appellant then picked up his pistol, which was within reach, and fired through the front door, striking Fendley in the head and killing him. Not knowing that he had hit Fendley, Appellant got up from the couch, changed his clothes, and went to the front door. According to Appellant, when he opened the door, he saw Fendley lying on the porch, saw his next-door neighbor walking in his direction, and said, "What have I done?" As Appellant explained in his police interview:

I grabbed my pistol. And I was trying to scare him. I

---

[2] Appellant did not testify at trial, but his police interview was admitted into evidence and played for the jury.

was going to shoot to the side of the door just to scare him so he would run and get away … and don't knock on that door no more. And I shot, and Lord have mercy, I done swear to God I did not mean to hit him. I swear. That was my friend…. I wanted to just scare him away so he won't knock on the door no more.

Appellant's next-door neighbor testified that, after the gunshot rang out, Appellant and Rainwater came outside through the front door.[3] According to the neighbor, Rainwater said to Appellant, "You didn't have to do that to him," and Appellant responded, "I was just trying to scare him away."

According to Rainwater, she then walked up the street to Fendley's father's house to tell him what had happened. And when Rainwater returned, Appellant was standing outside.

Captain Clifford Gibson responded to the scene and encountered Appellant and Rainwater outside their home. Captain Gibson testified that Appellant and Rainwater were "extremely intoxicated" and that he directed them to move back in case someone started shooting from inside the house. But according to Captain Gibson, Appellant informed him that he owned the house and that no one would be shooting from inside. Captain Gibson then asked Appellant if he knew who had shot the victim. And according to Captain Gibson, Appellant said, "Yeah, I did …. He wouldn't leave me alone." When asked during his police interview what he had told the police officer at the scene, Appellant said, "I

---

[3] Appellant's next-door neighbor gave a slightly different account than Appellant and Rainwater as to how the shooting occurred. He testified that Fendley went to Appellant's door "to get his stuff," that Appellant "hollered just get up out of here" before "slam[ing] the door in [Fendley's] face," that Fendley then knocked on the door "again," and that a gunshot rang out "a couple of seconds" later.

told him that it was an accident. I didn't mean to do it. I told him I was just trying to scare him off so he wouldn't knock on my door no more. I told him the same thing 'cause … it's the truth."

Although officers searched the house pursuant to a search warrant, they were unable to locate the firearm used to shoot Fendley. Finally, the State introduced into evidence Appellant's criminal record showing that he had been sentenced for burglary as a first-offender probationer and was on probation when the shooting occurred.

2. On appeal, Appellant argues that his trial counsel was constitutionally ineffective for failing to object to three comments the prosecutor made in closing arguments. To prevail on an ineffective-assistance-of-counsel claim, a defendant must show that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 US 668, 687 (1984). "If the defendant fails to establish either deficient performance or prejudice, this Court need not examine the other requirement." *Washington v. State*, 320 Ga. 839, 851 (2025).

"Establishing deficient performance requires a defendant to demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Washington*, 320 Ga. at 851 (quotation marks omitted). "There is a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." Id. (quotation marks omitted). "Overcoming that presumption requires an appellant to show that no reasonable lawyer would have done what his lawyer did or would have failed to do what his lawyer did not." Id. (cleaned up).

As we have made clear, "a closing argument is to be judged in the context in which it is made." *Lee v. State*, 317 Ga. 880, 887

(2023) (cleaned up). "[A] prosecutor is granted wide latitude in the conduct of closing argument and within the scope of such latitude is the prosecutor's ability to argue reasonable inferences from the evidence," id. (cleaned up), as well as the prosecutor's ability "to rebut closing arguments made by the defense," *Robinson v. State*, 323 Ga. 7, 19 (2025). "Moreover, whether to object to a particular part of a prosecutor's closing argument is a tactical decision, and counsel's decision not to make an objection must be patently unreasonable to rise to the level of deficient performance." *Lee*, 317 Ga. at 887 (cleaned up).

As relevant here, trial counsel argued in closing arguments that it would be unfair for Appellant to be held responsible for possessing a firearm when the evidence did not show that he knew his status as a first-offender probationer made it illegal for him to possess a firearm. Trial counsel further argued that Appellant intended to shoot away from Fendley and had hit him only by accident. And after noting that Fendley had aggressively knocked on the door and twisted the doorknob, trial counsel argued that a person does not have to wait until an intruder gets into his house before he can defend himself.

In response, the prosecutor made the following argument:

If you are supposed to be lawfully possessing the gun, where is it? Lying. And then you heard him; he came up with a story and it was conflicting — he wouldn't leave me alone. And then, oh, I was just trying to scare him. Which one is it[?] The thing is, he's trying to sit up here and manipulate the legal system by telling you these things about the first offender.

6

And then he tried to sit up here and manipulate the Fulton County District Attorney's Office, but he can't manipulate us. *He's sitting up here trying to manipulate you, you, you and you about this case when that cannot happen. He cannot manipulate you.*

And so all of this conduct of lying and trying to create scenarios that would put him into the position that, oh, the accident — oh, well at the same time I was protecting the home.

Which one is it? Lies. Lies. Trying to create a story to make you believe that he was justified in shooting somebody on the other side of the door?

*So you mean the Girl[ ] Scout is going to come knocking on the door. And if she knocks on the door to get more people's attention, he's going to be justified for shooting somebody on the other side of the door?* Anybody could have gotten shot. That bullet could have hit anybody outside, but that bullet hit [Fendley]. Unjustifiable.

…

Great bodily harm. And when you look at that[,] it's such force necessary to prevent it. That's not — *he's over 50 years old, too. And if you take it back to the old school, the old school is I'll meet you outside by the tree. The old school is if I know you and you're my friend, I can take you.*

*The old school is you already were coming in*

7

*and outside of the door.* What harm from the day that he was lying in there in the house being inside from drinking, from scrapping to all day switched because you decided you wanted to pick up a gun and it fire at him while he was on the other side of the door.

(Emphasis added.)

On appeal, Appellant contends that trial counsel should have objected to the italicized statements above because the contention that Appellant was "trying to manipulate" the jurors inappropriately "personaliz[ed] the verdict for the jurors," the Girl-Scout comment indicated that Appellant presented a "future danger[ ]" to society, the comments about Appellant's "age and old school mentality" were "inappropriate," and all three comments concerned "facts not in evidence." But as explained below, each of these comments fell within the wide latitude afforded to a prosecutor during closing argument, any objection would have been meritless, and Appellant's claim fails as a result.

First, the context surrounding the prosecutor's argument that Appellant was "trying to manipulate" the jury shows that the prosecutor was simply responding to trial counsel's closing argument and arguing that Appellant's defense theory was unpersuasive on its own terms and based on the trial evidence. See *Thompson v. State*, 318 Ga. 760, 768 (2024) (holding that the prosecutor did not make an improper argument by "highlighting that [the defendant's] theory of the case … was illogical based on the evidence"). Specifically, the prosecutor had drawn on the unexplained absence of the murder weapon at the scene to rebut trial counsel's contention that Appellant did not know his status as a first-offender probationer made it unlawful for him to possess a gun: according to the prosecutor, the jury could infer from the fact

that police officers were unable to locate the murder weapon that Appellant had hidden the gun, and that Appellant had hidden the gun because he knew he was not supposed to have it. And the prosecutor had further attempted to highlight a tension within the theory of the defense itself, namely, a tension between trial counsel's argument that Appellant accidentally shot Fendley in a mere attempt to scare him away and trial counsel's alternative argument that Appellant was trying to defend himself from Fendley's aggressive entry into the home. In this context, the prosecutor's statement in summary that the defense was attempting to mislead or manipulate the jury fell within the wide latitude afforded to prosecutors to draw inferences from the evidence and to respond to the theory of the defense. See *Stryker v. State*, 318 Ga. 769, 779–80 (2024) (holding that the trial court did not abuse its discretion in permitting a prosecutor to argue that "the defense's argument was as reasonable as saying that aliens came down and shot [the victim], that the argument did not compute with common sense, and that they [the defendant and trial counsel] are insulting our intelligence" because, in context, the prosecutor was simply "challenging the reasonableness of the defense theory" (cleaned up)). See also *Moody v. State*, 316 Ga. 490, 538 (2023) (holding that an objection to a prosecutor's closing remark that the defense's argument was "offensive" to the jury would have been "meritless").

Second, the record belies Appellant's contention that the prosecutor's Girl-Scout comment was an improper argument about Appellant's future dangerousness. "A prosecutor argues future dangerousness when the prosecutor asserts there will be more victims if the defendant is not found guilty, or the community or witnesses will be endangered if the defendant is not found guilty." *Smith v. State*, 323 Ga. 246, 254 (2026) (quotation marks omitted). Here, however, the prosecutor was not commenting on

9

Appellant's future conduct. To the contrary, the prosecutor focused exclusively on the act of shooting Fendley itself, explaining that someone knocking loudly on a front door is not adequate justification for using deadly force, and that shooting through an opaque front door recklessly endangered anyone who might be outside — whether that be a Girl Scout selling cookies door-to-door, Fendley, or another bystander. And that argument was properly grounded in the trial evidence, which showed that Appellant shot Fendley shortly after Fendley had knocked loudly on the door and that another community member (Appellant's next-door neighbor) was outside the house and thus at risk of being shot when Appellant fired through his closed front door. Accordingly, an objection to this comment would have been meritless. Cf. *Smith*, 323 Ga. at 254–55 (an objection on "future dangerousness" grounds would have been overruled where the prosecutor "ma[de] a permissible inference from the evidence" by "suggesting that [the defendant], who had brazenly killed [the victim] in the presence of numerous witnesses, might have expected that those witnesses would be afraid of him and would therefore not testify against him").

Finally, Appellant has not shown that an objection to the prosecutor's comments about Appellant's "age" and about "the old school" would have been sustained. Contrary to Appellant's argument, the prosecutor was not arguing facts not in evidence by referencing Appellant's age, which was established at trial both through his criminal record and through Appellant's police interview. And even assuming Appellant is correct that it would have been improper for the prosecutor to argue that Appellant had, or acted in conformity with, an "old school mentality," the prosecutor did not make such an argument. The record shows that the prosecutor argued just the opposite — that Appellant's use of deadly force showed he did not have, or did not act in conformity with,

an "old school" mentality, which at most might condone challenging a person to a physical fight to settle a dispute.[4]

Because the objections to the prosecutor's closing argument that Appellant contends trial counsel should have made would have been meritless, he has not shown deficient performance. See *Lee*, 317 Ga. at 888. Accordingly, these claims fail.

3. As noted in footnote 1 above, the jury found Appellant guilty of involuntary manslaughter as a lesser offense of malice murder. On appeal, Appellant argues that, under *Edge v. State*, 261 Ga. 865 (1992), the trial court was required to sentence him for involuntary manslaughter rather than for felony murder predicated on possession of a firearm by a first-offender probationer. We disagree.

"In *Edge*, this Court held that, when a defendant is found guilty of voluntary manslaughter and felony murder premised on an aggravated assault (both arising from the same assault), the defendant should be convicted and sentenced only for voluntary manslaughter." *Anthony v. State*, 303 Ga. 399, 402 (2018). "We reasoned that almost every voluntary manslaughter involves a felonious assault, and if a verdict that the defendant was guilty of felony murder premised on aggravated assault were to prevail over a finding that the defendant also was guilty of voluntary

---

[4] It is unclear precisely what the prosecutor intended to convey when he said, "The old school is you already were coming in and outside of the door." In context, it appears that the comment was an inartful transition from commenting on how Appellant's conduct was not justified even from an "old school" perspective to arguing that there was no justification for Appellant using deadly force against Fendley. In any event, there is no indication in this remark that the prosecutor was accusing Appellant of having an "old school mentality."

manslaughter, it would effectively eliminate voluntary manslaughter as a separate form of homicide." Id. (quotation marks omitted). "We also explained that culpability for an aggravated assault is naturally susceptible of mitigation by the sort of provocation and passion that inheres in voluntary manslaughter." Id.

"We later extended the rule of *Edge* to instances in which the felony murder is premised not on aggravated assault, but on another underlying felony that is equally integral to the homicide and susceptible of mitigation by the sort of provocation and passion that voluntary manslaughter involves." *Anthony*, 303 Ga. at 402. "We have, however, declined to extend *Edge* any further than that." Id. And we have specifically held that the rule announced in *Edge* does not apply to cases like this one, "in which the jury returns verdicts of felony murder and involuntary manslaughter," *Kipp v. State*, 296 Ga. 250, 252 (2014), or in which the jury returns a verdict of "felony murder predicated on possession of a firearm by a first-offender probationer," *Owens v. State*, 317 Ga. 125, 125, 127 (2023). Accordingly, this claim fails.

*Judgment affirmed. All the Justices concur.*